147 F.3d 502
 GLEN COAL COMPANY and Old Republic Insurance Company, Petitioners,
v.
Jess SEALS and Director, Office of Workers' Compensation
Programs, United States Department of Labor, Respondents.
 No. 96-4121.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 1, 1997.
Decided June 24, 1998.
 
 Laura Metcoff Klaus (briefed), Mark E. Solomons (argued and briefed), Arter & Hadden, Washington, DC, for Petitioners.
 Harold Ronnie Montgomery, Jonesville, VA, Christian P. Barber, Gary K. Stearman (argued and briefed), U.S. Department of Labor, Office of the Solicitor, Washington, DC, for Respondents.
 Before: BOGGS and MOORE, Circuit Judges; and DOWD, District Judge.*
 DOWD, D. J., delivered the opinion of the court. BOGGS, J. (pp. 515-17), delivered a separate opinion concurring in the judgment. MOORE, J. (pp. 517-22), delivered a separate opinion concurring in part and dissenting in part.
 
 OPINION
 
 1
 DOWD, District Judge.
 
 INTRODUCTION
 
 2
 Petitioners Glen Coal Company and its insurer Old Republic Insurance Company (collectively "Petitioners") appeal an award of benefits under the Black Lung Benefits Act. 30 U.S.C. §§ 901-945. An administrative law judge ("ALJ") of the United States Department of Labor ("DOL") ordered Petitioners to pay certain medical bills of Respondent Jess Seals ("Seals"), holding that Petitioners had failed to rebut a presumption established in the Fourth Circuit that Seals' medical bills were related to his pneumoconiosis (Black Lung disease of respiratory system). This award was subsequently affirmed by the Benefits Review Board. An appeal was noticed to the United States Court of Appeals for the Fourth Circuit, but it was then determined that Seals had incurred his injury from his work in coal mines in Kentucky. Accordingly, the Fourth Circuit granted Petitioners' motion to transfer the appeal to this Court in accordance with 28 U.S.C. § 1631.
 
 
 3
 On appeal, Petitioners argue for a remand to the ALJ on the grounds that the Fourth Circuit presumption applied below is inconsistent with the law of the Sixth Circuit because the presumption impermissibly reallocates the burden of proof in a manner that conflicts with § 7(c) of the Administrative Procedure Act ("APA"). 5 U.S.C. § 556(d). Specifically, Petitioners argue that under § 7(c) of the APA, the burden should be on Seals, the claimant, to prove that the medical bills are related to his pneumoconiosis. Seals and co-Respondent Director, Office of Workers' Compensation Programs, United States Department of Labor ("Director") (collectively "Respondents"), on the other hand, argue that the presumption merely reallocates the burden of production, and therefore does not violate § 7(c) of the APA.
 
 
 4
 These arguments require us to examine whether the Fourth Circuit presumption is consistent with Sixth Circuit law. This is a two step process: (1) does the presumption violate § 7(c) of the APA, in which case it is an impermissible presumption; and (2) if it does not violate § 7(c) of the APA, does it otherwise conflict with the law of this Circuit concerning Black Lung Benefits Act issues?
 
 
 5
 After careful review of the matter, and for the reasons set forth below, we hold that the judicial presumption created by the Fourth Circuit and applied by the ALJ is inconsistent with the law of the Sixth Circuit. While we find that the presumption does not violate § 7(c) of the APA, we find that it nonetheless runs afoul of the purposes of the Black Lung Benefits Act. As a result, we VACATE the decision awarding benefits to Seals, and REMAND to the ALJ for a determination of Petitioners' liability for the medical bills here in dispute under the legal standard stated herein for the Sixth Circuit.
 
 
 6
 Before addressing the substantive issues on appeal, an overview of the structure of the Black Lung Benefits Act is instructive.OVERVIEW OF THE BLACK LUNG BENEFITS ACT
 
 
 7
 The Black Lung Benefits Act was enacted to "provide benefits ... to coal miners who are totally disabled due to pneumoconiosis and to the surviving dependents of miners whose death was due to such disease." 30 U.S.C. § 901(a). Under the Act, pneumoconiosis is defined as "a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment." 30 U.S.C. § 902(a).
 
 
 8
 Part B of the Black Lung Benefits Act provides for monthly cash benefits to the claimant, but no health care benefits. 30 U.S.C. §§ 921-925. Part B claims are paid by the federal government and do not involve the mine operators or the DOL.
 
 
 9
 Part C of the Black Lung Benefits Act, on the other hand, establishes an employer-funded federal workers compensation program to provide benefits, in cooperation with the states, for total disability or death due to pneumoconiosis, and is administered by the DOL. 30 U.S.C. §§ 931-945.[1] Medical benefit entitlements under Part C of the Black Lung Benefits Act are governed generally by 20 C.F.R. §§ 725.701-725.707. The procedure for determining entitlement has been held to be a two-stage procedure. See Lute v. Split Vein Coal Company, No. 84-2087 BLA, O.W.C.P. No. aze-kl-gkxz 1987 WL 107347, * 2 (Ben.Rev.Bd. March 20, 1987). The first stage is the liability phase, which involves the determination of whether the miner is totally disabled from pneumoconiosis, thereby making the employer/operator responsible; and the second stage is the determination of the employer/operator's liability for individual medical bills. See Lute, supra, at * 2.
 
 
 10
 The first stage is governed by 20 C.F.R. § 727.203, which states that a miner is entitled to an "interim presumption" of total disability due to pneumoconiosis resulting from coal mine work if the miner worked in a coal mine for over 10 years and the miner can offer certain listed medical evidence.[2] Following the miner's offering of this evidence, the miner is entitled to the statutory "interim presumption" that he is totally disabled from pneumoconiosis. Then, the employer can rebut this presumption in one of four listed ways.[3] Alternatively, the employer could concede that the miner is totally disabled, but argue that some malady other than or in addition to a respiratory ailment is responsible for the disability, employing one of the listed rebuttal methods. Cal-Glo Coal Company v. Yeager, 104 F.3d 827, 831 (6th Cir.1997).
 
 
 11
 After the decision has been made that the miner is totally disabled from pneumoconiosis, the employer/operator is liable for the medical bills incurred in treatment. See Lute, supra, at * 2. The analysis then moves to the second stage. With liability settled, the question becomes whether the individual bills are related to the miner's pneumoconiosis. The procedure for disputes concerning medical benefits is found in 20 C.F.R. § 725.707. This section, unlike the section concerning the initial determination of liability, does not set out any statutory presumptions. Rather, it merely states that if the dispute cannot be resolved by the district director, then it proceeds to the Office of Administrative Law Judges. 20 C.F.R. § 725.707(b).
 
 BACKGROUND FACTS
 
 12
 Seals was a miner for approximately seventeen years. He stopped working in 1972, at the age of 42, following a back injury. Additionally, Seals smoked a pack of cigarettes a day for approximately 35 years.
 
 
 13
 Within a year of stopping work, Seals was awarded benefits from the Social Security Administration under Part B of the Black Lung Benefits Act. 30 U.S.C. §§ 921-925. This award is not at issue in this case because, as explained above, Part B claims are paid by the federal government and do not involve the mine operators or the DOL.
 
 
 14
 On June 27, 1979, Seals filed a claim for health benefits under Part C of the Black Lung Benefits Act. See 30 U.S.C. §§ 931-945. These benefits are at issue in this case.
 
 
 15
 The Old Republic Insurance Company ("Old Republic"), the black lung insurance carrier for the Glen Coal Company ("Glen Coal"), was notified of Seals' claim sometime in 1984. Old Republic agreed without further proceedings to pay the cost of black lung related health care provided to Seals. In fact, the parties entered into an agreement stating that Seals "meets the standard of total disability under the Black Lung Benefits Act (30 U.S.C. 901 et seq.). The above coal mine operator [ (Glen Coal) ] further agrees to pay medical benefits and to reimburse the Black Lung Disability Trust Fund for any medical benefit payments made." Subsequently, on June 11, 1984, the DOL deputy commissioner issued an uncontested award of benefits to Seals providing as follows:
 
 
 16
 The responsible operator [ (Glen Coal) ] shall provide to the claimant [ (Seals) ] all reasonable and necessary medical benefits required for the treatment of his pneumoconiosis condition, including the reasonable costs of transportation to obtain such treatment, beginning, June 27, 1979 and continuing, in accordance with the provisions and limitations of the Act.
 
 
 17
 The DOL also informed Old Republic that no bills had been submitted in the period from June 1979 to June 1984 for treating Seals' pneumoconiosis.
 
 
 18
 The Longshore and Harborworkers' Compensation Act ("LHWCA") requires a health care provider who begins to treat a compensation beneficiary to give notice to the employer and to provide certain reports outlining the course of treatment to be followed. 33 U.S.C. § 907(d). Petitioners here, however, claim that after accepting liability to pay the cost of treating Seals' pneumoconiosis, Petitioners never received a first report from a treating physician, and, in fact, did not receive any information from any physician at all.
 
 
 19
 Nonetheless, beginning in 1985, Old Republic began receiving bills for prescription antibiotics and bronchodilators[4] for Seals. No information was provided to show that the infection being treated was caused by pneumoconiosis, and for that reason, Old Republic declined to pay the bills. Old Republic wrote several letters to the pharmacist who sent the bills, stating that Old Republic was not responsible for payment for the antibiotics since they could not be for treatment of pneumoconiosis, which is "not infectious in nature."
 
 
 20
 In 1987, Seals submitted the unpaid bills to the DOL. Dr. Cander, the DOL's medical consultant, reviewed the medical bills. On April 25, 1988, Dr. Cander concluded that under the Federal Black Lung Act, the use of bronchodilators was reimbursable, but the antibiotic therapy was not. Therefore, it was Dr. Cander's recommendation that Glen Coal pay for the bronchodilator treatments, but not the antibiotic therapy.
 
 
 21
 On August 10, 1988, the DOL adopted Dr. Cander's conclusion and ordered Glen Coal to pay for the bronchodilator treatment. Old Republic again refused, stating that the record contained no justification for bronchodilator therapy, and that Seals' most recent x-ray had been negative for clinical pneumoconiosis.
 
 
 22
 Due to the fact that the dispute continued, the DOL forwarded the case to the Office of Administrative Law Judges on May 18, 1989. Administrative Law Judge Clement J. Kichuk ("the ALJ") heard this case on November 6, 1991. On June 2, 1992, the ALJ issued his decision, ordering Petitioners to pay for both the bronchodilators and the antibiotics, with a total amount owed of approximately $1,900.
 
 
 23
 The ALJ began his decision by setting out the two ways in which the first stage determination of total disability by pneumoconiosis may be reached:
 
 
 24
 [a] mine operator is responsible for a claimant's pneumoconiosis if either 1) it is determined in an adjudication that the miner is totally disabled due to pneumoconiosis, and is, therefore, entitled to benefits under the Act or 2) the mine operator voluntarily agrees to pay the cost of such treatment by conceding the claimant's general eligibility. Doris Coal Company v. Director, OWCP, 938 F.2d 492, 15 BLR 2-135, 138 (4th Cir.1991); Lute v. Split Vein Coal Company, 11 BLR 1-82, 1-84 (1987).
 
 
 25
 The ALJ then held that Glen Coal was liable for the treatment of Seals' pneumoconiosis due to the prior agreement. Therefore, the only issue for adjudication by the ALJ was the second stage issue of whether Seals had established that the medical bills at issue were for the treatment of his pneumoconiosis.
 
 
 26
 The ALJ then noted that under the Act, Seals was required to establish that the medical bills were necessary to treat his pneumoconiosis, but held that Seals did not need to make any preliminary evidentiary offering, citing the rationale of the Fourth Circuit case of Doris Coal Company v. Director, OWCP, 938 F.2d 492 (4th Cir.1991).[5] Instead, adopting that Fourth Circuit decision, the ALJ concluded that Seals was entitled to the so-called "Doris Coal presumption" that the bills were related to his pneumoconiosis, and therefore Petitioners bore the burden of rebutting this presumption by showing the bills were not related to Seals' pneumoconiosis.
 
 
 27
 Explaining the Doris Coal decision and the reasons for its applicability in the instant case, the ALJ focused on the Doris Coal court's distinction between "clinical" or "medical" pneumoconiosis and "legal" pneumoconiosis:
 
 
 28
 The Act defines pneumoconiosis as a "chronic dust disease of lung ... arising out of coal mine employment." 30 U.S.C. § 902(b). As we recognized in Hobbs v. Clinchfield Coal Co., 917 F.2d 790, 791 n. 1 (4th Cir.1990), "clinical" or "medical" pneumoconiosis must be distinguished from "legal" pneumoconiosis. Medical pneumoconiosis is "the lung disease caused by the fibrotic reaction of the lung tissue to inhaled dust ..." Id. Legal pneumoconiosis., [sic] however, is much broader and "refers to all lung diseases which meet the statutory or regulatory definition of being any lung disease which is significantly related to, or substantially aggravated by, dust exposure in coal mine." Id.
 
 
 29
 Id. at 496. The Doris Coal Court then applied the broader legal definition of pneumoconiosis to the miner's burden, and in so doing created the presumption that is at issue on this appeal:
 
 
 30
 Based on this broad definition, a miner meets his burden of showing that his medical expenses were necessary to treat pneumoconiosis if his treatment relates to any pulmonary condition resulting from or substantially aggravated by the miner's pneumoconiosis. Since most pulmonary disorders are going to be related or at least aggravated by the presence of pneumoconiosis, when a miner receives treatment for a pulmonary disorder, a presumption arises that the disorder was caused or at least aggravated by the miner's pneumoconiosis, making the employer liable for the medical costs.
 
 
 31
 Id. at 496-97 (emphasis added).
 
 
 32
 After reviewing the rationale of the Doris Coal court, the ALJ held that because the parties here had agreed that Seals was totally disabled from pneumoconiosis, as defined under the Act, they had agreed to the broader definition of "legal" pneumoconiosis, and therefore the Doris Coal presumption applied. Seals was therefore entitled to the presumption that the "disabling pulmonary disorder" for which he received treatment was caused or at least aggravated by his pneumoconiosis. As such, Glen Coal was responsible for the medical costs. The ALJ concluded that the presumption was proper because "[t]o hold otherwise would, in effect, require [Seals] to prove again that his respiratory ailment is related to his coal mine employment, thus, placing an undeserved burden upon [Seals] and on the black lung benefits system. See Doris Coal Company, 15 BLR at 140 [938 F.2d 492]." Glen Coal was then afforded the opportunity to rebut this presumption.
 
 
 33
 The ALJ then made specific findings of fact with respect to four doctors' reports to determine whether they were sufficient to rebut the presumption that the bills were related to Seals' pneumoconiosis. Drs. McQuillan and Kanwal concluded that the medical treatments at issue were related to Seals' pneumoconiosis. Dr. McQuillan based his findings on a review of the treatment and office notes of Seals' physician; Dr. Kanwal based his opinion on two examinations of Seals in 1990, and his review of the prior medical records of Seals. The ALJ found that the other two doctors (Drs. Dahhan and Branscomb), on the other hand, concluded that the medical treatments at issue were not related to Seals' pneumoconiosis. Dr. Dahhan examined Seals on three occasions in 1989 and 1990, and both he and Dr. Branscomb concluded that the prescribed medications were for chronic bronchitis and bronchospasm resulting from Seals' smoking history. Moreover, Dr. Dahhan concluded that there was not enough evidence to diagnose pneumoconiosis.
 
 
 34
 The ALJ held that neither the opinion of Dr. Dahhan nor the opinion of Dr. Branscomb was sufficient to rebut the presumption that the disorder for which Seals was receiving treatment was caused or aggravated by pneumoconiosis. The ALJ found the report of Dr. Dahhan to be unpersuasive because Dr. Dahhan opined that Seals did not have pneumoconiosis despite the fact that the parties had stipulated to that fact, and the DOL had already awarded medical benefits to Seals. Therefore, the ALJ held that Dr. Dahhan's report was "contrary to the spirit of the Act in that a final determination of entitlement to medical benefits precludes raising the basic issues of entitlement."
 
 
 35
 The ALJ found Dr. Branscomb's report unpersuasive because it was conclusory in nature. Dr. Branscomb opined that the treatments were for pulmonary disorders caused by Seals' smoking rather than his pneumoconiosis. However, because Dr. Branscomb did not explain the reasons for this opinion, the ALJ was not persuaded.
 
 
 36
 The ALJ then made specific findings himself concerning whether Seals' cigarette smoking played a part in his respiratory problems.
 
 
 37
 The Court notes that pneumoconiosis is irreversible and is a progressive disease. While his symptoms secondary to cigarette smoking ordinarily would be expected to stabilize upon cessation of tobacco use, claimant's COPD[6] advanced even after he quit smoking. The Court is not persuaded by [Petitioners'] rebuttal evidence urging that pneumoconiosis made no contribution to the claimant's lung disease manifested by COPD and chronic bronchitis as well as by other pulmonary and respiratory afflictions.
 
 
 38
 In conclusion, the ALJ ordered Petitioners to pay for both the bronchodilators and the antibiotics prescribed for Seals.
 
 
 39
 Petitioners appealed this decision to the Benefits Review Board. The Board upheld the decision of the ALJ on the grounds that it was supported by substantial evidence and there was no reversible error. Further, the Board upheld the application of the Doris Coal presumption to this case, and also upheld all of the ALJ's findings of fact with regard to the four doctors' reports. One member of the Board, however, wrote a separate concurrence to the Board's affirmance of the ALJ's order. While believing that the "court-created" presumption was contrary to the holding of the United States Supreme Court in Director, OWCP Department of Labor v. Greenwich Collieries [Ondecko], 512 U.S. 267, 114 S.Ct. 2251, 129 L.Ed.2d 221 (1994)(claimant must prove his case by a preponderance of the evidence, in accordance with § 7(c) of the APA), the member wrote that he was concurring in the opinion because the substantial evidence supported the ALJ's award of medical benefits.
 
 
 40
 An appeal was subsequently taken to the United States Court of Appeals for the Fourth Circuit. The Fourth Circuit transferred the matter to this Court pursuant to 28 U.S.C. § 1631 upon discovery that Seals' coal mine work occurred in the Sixth Circuit, in Kentucky. Before this Court is therefore an issue of first impression of whether the Fourth Circuit Doris Coal presumption is consistent with the law of the Sixth Circuit, as governed by § 7(c) of the APA.
 
 PROPRIETY OF APPLICATION OF THE DORIS COAL
 PRESUMPTION IN THE SIXTH CIRCUIT
 
 41
 Petitioners argue that this Court should vacate the order of the ALJ in this case and remand for proceedings under Sixth Circuit law, as governed by § 7(c) of the APA. Petitioners argue that the Fourth Circuit presumption relied upon by the ALJ is improper as a matter of law because it shifts the burden of proof[7] to Petitioners, in conflict with § 7(c) of the APA, which states that the burden of proof is on the proponent of a rule or order (i.e. Seals in this case) unless statutorily changed. Petitioners rely on the Supreme Court decision of Director, OWCP, Department of Labor v. Greenwich Collieries [Ondecko], 512 U.S. 267, 114 S.Ct. 2251, 129 L.Ed.2d 221 (1994), which struck down a judicially created presumption in conflict with § 7(c) of the APA because it attempted to place the burden of proof on other than the claimant.
 
 
 42
 Respondents, on the other hand, argue that the Doris Coal presumption does not violate the rule of Greenwich Collieries and is therefore consistent with § 7(c) of the APA and the law of the Sixth Circuit. Respondents argue that the Doris Coal presumption merely reallocates the burden of production,[8] and Greenwich Collieries only prohibits a reallocation of the burden of proof.
 
 1. Standard of Review
 
 43
 The court of appeals has a very narrow scope of review over decisions of the Benefits Review Board. Cal-Glo Coal Company v. Yeager, 104 F.3d 827, 830 (6th Cir.1997). The ALJ hears the evidence and makes findings of fact. Director, OWCP, United States Department of Labor v. Quarto Mining Company, 901 F.2d 532 (6th Cir.1990). The Benefits Review Board then reviews the findings of fact and conclusions of law of the ALJ and may set them aside "only if they are not supported by substantial evidence in the record considered as a whole or if they are not in accordance with law." Quarto, supra, at 536.
 
 
 44
 The court of appeals' review of the Benefits Review Board is then "limited to a determination whether the outcome below is supported by substantial evidence and was reached in conformance with applicable law." York v. Benefits Review Board, 819 F.2d 134, 136 (6th Cir.1987). This circuit has stated that the court of appeals must affirm the Board's decision if the Board has not committed any legal errors or exceeded its statutory scope of review of the ALJ's factual determinations. See Pyro Mining Co. v. Slaton, 879 F.2d 187 (6th Cir.1989). Furthermore, as in the court of appeals' review of a district court decision, the court of appeals may affirm the decision of the Board on grounds other than those stated by the Board. See Old Ben Coal Co. v. Luker, 826 F.2d 688 (7th Cir.1987).
 
 
 45
 2. Statutory Burdens Applicable to the Black Lung Benefits Act
 
 
 46
 Section 7 of the APA states that "[e]xcept as otherwise provided by statute, the proponent of a rule or order has the burden of proof."[9] 5 U.S.C. § 556(d). The United States Supreme Court has held that this burden of proof provision applies to adjudications under the Black Lung Benefits Act. Director, OWCP, Department of Labor, v. Greenwich Collieries [Ondecko], 512 U.S. 267, 270, 114 S.Ct. 2251, 2254, 129 L.Ed.2d 221 (1994). There, the Supreme Court stated that its prohibition of certain judicially created presumptions would not overburden Black Lung claimants because Congress realized that these claims could be hard to prove, and so created certain statutory presumptions to ease claimants' burdens. Id. at 280, 114 S.Ct. 2251. In conclusion, the Court held that the Department of Labor Administrative Law Judges cannot formulate additional presumptions which allocate the burden of proof in a manner that is in conflict with the APA. Id. at 281, 114 S.Ct. 2251.
 
 
 47
 3. Does the Doris Coal presumption improperly reallocate the burden of proof?
 
 
 48
 In this case, the ALJ and the Board were confronted with a situation in which the first stage of the Black Lung Benefits Act analysis had been settled by agreement. The parties had agreed that Seals was totally disabled by pneumoconiosis and that Petitioners were the responsible party. Absent this agreement, the first stage would have required Seals to prove that he was totally disabled by pneumoconiosis. 20 C.F.R. § 727.203. Here, however, because the parties agreed that Seals was totally disabled from pneumoconiosis and that Glen Coal was the responsible operator, the dispute involved the second stage determination of whether Petitioners had to pay certain of Seals' medical bills.
 
 
 49
 Faced with this situation, the ALJ followed the Fourth Circuit case of Doris Coal. The Doris Coal court recognized that in the second stage, the miner had the "burden" of proving that the bills were related to the pneumoconiosis. However, the court held that following a first stage determination of liability, the miner is entitled to a presumption that the bills are related to pneumoconiosis, and the "burden" is therefore on the employer/carrier to rebut this presumption by showing the bills are not related to pneumoconiosis. The Doris Coal court did not cite any case law or statute which supported the creation of this presumption. Rather, the Doris Coal court stated that this presumption was warranted because "most pulmonary disorders are going to be related or at least aggravated by the presence of pneumoconiosis." Doris Coal, supra, at 496-97. Furthermore, the Doris Coal court seemed to suggest that because the miner bore the "burden" of proving his pneumoconiosis in the first stage, it would be unfair, and against the spirit of the Black Lung Benefits Act, to place the "burden" on the miner in the second stage as well.
 
 
 50
 Petitioners argue that the Doris Coal presumption is contrary to the legal standards applicable to the Black Lung Benefits Act based on the Supreme Court case of Greenwich Collieries, supra. In that case, the Supreme Court held that § 7(c) of the APA applies to the Black Lung Benefits Act, and thus places the burden of proof on the proponent of a rule or order unless otherwise stated by statute. Id. at 271, 114 S.Ct. 2251. The Court then struck down the so-called "true doubt" rule which said that when the evidence was evenly balanced, the claimant wins, holding it conflicted with § 7(c) of the APA. Id. at 281, 114 S.Ct. 2251. The Court held that this judicially created presumption "ran afoul of the APA, a statute designed 'to introduce greater uniformity of procedure and standardization of administrative practice among the diverse agencies whose customs had departed widely from each other.' " Id. at 280-81, 114 S.Ct. 2251, quoting Wong Yang Sung v. McGrath, 339 U.S. 33, 41, 70 S.Ct. 445, 94 L.Ed. 616 (1950).
 
 
 51
 Respondents argue on appeal that the Doris Coal presumption is distinguishable from the invalid "true doubt rule" because the Doris Coal presumption merely reallocates the burden of production, not the burden of proof, and therefore is valid under Greenwich Collieries. In support of this argument, Respondents cite the case of Lovilia Coal Co. v. Harvey, 109 F.3d 445 (8th Cir.1997), in which the Eighth Circuit upheld a presumption created by the Director of the Department of Labor, rejecting the argument that it violated § 7(c) of the APA. The presumption at issue in Lovilia was called the "one-element" standard, and concerned the first stage determination of entitlement of a miner who was previously denied benefits at the first stage. As discussed earlier, to be entitled to benefits at the first stage, the miner must show three elements: (1) total disability, (2) that disability was caused "at least in part by pneumoconiosis," and (3) that "disability arose out of coal mine employment." Lovilia, supra, at 451. Under the "one-element" standard, a miner arguing that a previous denial of benefits was incorrect need only show that there has been a material change in one of the three elements required for entitlement.
 
 
 52
 If a claimant presents such evidence, "[a]bsent contrary evidence clearly demonstrating that the denial of the initial claim was a mistake," an inference of material change is "compelled" and an ALJ "must then consider whether all the evidence in the record, including the evidence predating the denial of the prior claim, supports an entitlement to benefits."
 
 
 53
 Id. at 451.
 
 
 54
 The Lovilia Plaintiff contended that the Director's "one-element" standard was invalid because it violated § 7(c) of the APA, requiring that "the proponent of a rule or order has the burden of proof." Plaintiff there relied on Greenwich Collieries for the holding that a judicially created presumption in the Black Lung Benefits Act is invalid under § 7(c) if it shifts the burden of proof to the party opposing the benefits claim.
 
 
 55
 The Eighth Circuit rejected Plaintiff's argument and upheld the Director's "one-element" standard. Id. at 452. The court held that while the Director's standard did indeed create a presumption, this presumption did not violate § 7(c) because it shifted the burden of production,[10] not the burden of proof.[11] Id. at 452-53. The court stated that Greenwich Collieries stood for the proposition that the burden of proof could not be allocated in a manner that conflicts with § 7(c), but did not hold that burdens of production could not be shifted. Id. at 452. The Eighth Circuit held that the "one-element" standard still kept the burden of proof on the claimant to prove his entitlement by a preponderance of the evidence; the only thing it did was ease the claimant's burden of production by reducing the amount of evidence that the claimant had to come forward with in order to support his claim. Id. Even though this works to the advantage of the claimant by requiring less of a showing of evidence in order to support his claim, it does not reallocate his ultimate burden of proving his entitlement by a preponderance of the evidence. In fact, the Eighth Circuit continued, not only did the "one element" standard not violate Greenwich Collieries, it was akin to the presumptions expressly approved of by the Greenwich Collieries court:
 
 
 56
 The [Greenwich Collieries ] Court indicated that the statutory and regulatory presumptions which ease a claimant's burden of production (i.e., "a party's obligation to come forward with evidence supporting its claim") do not violate the APA.
 
 
 57
 Id.
 
 
 58
 In the instant case, Respondents urge this court of appeals to apply the reasoning of the Eighth Circuit in Lovilia and find the Doris Coal presumption to be consistent with § 7(c) of the APA because it merely reallocates the burden of production rather than impermissibly reallocating the burden of proof. This requires an analysis of the Doris Coal presumption in order to determine which burden is truly being reallocated.
 
 
 59
 The Doris Coal presumption states that if a miner proves his entitlement to benefits in stage one, the miner is entitled to a presumption in stage two that the medical bills he presents are related to his pneumoconiosis, thus making the employer/carrier liable. The employer/carrier must then come forward with evidence to rebut this presumption and show that the bills are not related to the miner's pneumoconiosis.
 
 
 60
 We hold that the Doris Coal presumption merely reallocates the burden of production, and does not affect the burden of proof. The effect of the Doris Coal presumption is to find that where there is a stage one determination that the claimant is totally disabled due to pneumoconiosis, then in stage two the claimant does not have to come forward with any additional evidence to prove that his medical bills are related to his pneumoconiosis; instead, the employer/carrier must come forward with evidence demonstrating that the bills are not related to his pneumoconiosis. Under this analysis, the only thing that changes is that the claimant's initial burden of coming forward with evidence supporting his stage two claim is eased by virtue of the determination in the first stage that he has pneumoconiosis--i.e. his burden of production is eased and placed on the employer/carrier from the outset. The presumption does not change the fact that the claimant still bears the burden of proof to show by a preponderance of the evidence that his bills are related to his pneumoconiosis, rather it allows him to satisfy his burden of production (i.e. producing evidence to support his claim) by relying on the determination in the first stage that he is disabled by pneumoconiosis. The claimant still must satisfy the trier of fact that the bills are related, but the claimant is relieved of the requirement of producing additional evidence of this relationship. He may rely on the first stage determination to show the relatedness of his condition and the medical treatment at issue.
 
 
 61
 Under this reasoning, we find the Doris Coal presumption to be valid under Greenwich Collieries because it reallocates only the burden of production, and not the ultimate burden of proof. However, despite the fact that we find the Doris Coal presumption withstands scrutiny under Greenwich Collieries, we nonetheless hold it is inconsistent with Sixth Circuit law because it does not further the purposes of the Black Lung Benefits Act.
 
 
 62
 4. The Doris Coal presumption is inconsistent with Sixth Circuit law because it does not advance the purposes of the Black Lung Benefits Act, as explained in Greenwich Collieries.
 
 
 63
 The Greenwich Collieries case discusses more than the technical differences between the burdens of proof and production. It is true that in that case the Supreme Court engaged in a long discussion of the meaning of the terms "burden of proof" and "burden of production" and then came to the conclusion that the "true doubt" rule was invalid because it was a judicially created presumption which allocated the burden of proof in a manner that conflicted with § 7(c) of the APA. But to infer the inverse and interpret Greenwich Collieries to actually encourage judicially created presumptions that merely reallocate the burden of production would, we feel, be a limited reading of the case and would lead to great confusion in the application of the Black Lung Benefits Act. In fact, Greenwich Collieries makes some important observations about the Black Lung Benefits Act, which suggest that the Black Lung Benefits Act was intended to be applied with uniformity which could be destroyed if the door is suddenly opened to the creation of judicial presumptions.
 
 
 64
 The Greenwich Collieries Court stated that Congress realized that these Black Lung benefits claims would be difficult to prove, and therefore created statutory presumptions to ease the claimant's burden. Greenwich Collieries, supra, at 280, 114 S.Ct. 2251. The Court then explained that the problem with the "true doubt" presumption was that it ran "afoul of the APA, a statute designed 'to introduce greater uniformity of procedure and standardization of administrative practice among the diverse agencies whose customs had departed widely from each other.' " Id. at 280-81, 114 S.Ct. 2251. The Court then stated that the concern of losing the desired uniformity would be directly implicated if each agency is free to create presumptions that would reallocate the burdens that the parties must bear. Id. at 281, 114 S.Ct. 2251. Therefore, the Court seemed to suggest that in order to achieve uniformity, the only presumptions that should be applied were statutory presumptions.
 
 
 65
 In the instant case, while we find that the Doris Coal presumption merely reallocates the burden of production and therefore does not violate the APA burden of proof provisions, we look further into the Greenwich Collieries opinion and conclude that the concern expressed by the Supreme Court that judicially created presumptions would destroy the desired uniformity in the Black Lung Benefits Act requires that the Sixth Circuit find the judicial presumption inconsistent with the law of this Circuit. If we were to hold otherwise, then the door will be opened to the creation of other judicial presumptions in this Circuit and thereby destroy the desired uniformity of application of the Black Lung Benefits Act. The claimants in one district might have a harder time proving their entitlement to benefits than the claimants in another district, which would run afoul of the desired uniformity of the Act.
 
 
 66
 Further, aside from the Greenwich Collieries case, the Black Lung Benefits Act itself is set up to be a two-step process: the first stage determines entitlement and the second stage determines whether the particular medical bills are related to the entitlement. The Doris Coal presumption does not respect this two-step process, but rather attempts to reshape it as one stage through the application of this judicially created presumption. This is simply at odds with the purposes of the Black Lung Benefits Act. Not only does the Act create a two-step process, but there is already a statutory presumption written into the first stage: if the miner shows certain evidence of pneumoconiosis, there is a rebuttable presumption that he is totally disabled by pneumoconiosis. 20 C.F.R. § 727.203(a). To now allow the Doris Coal presumption to work at the second stage would destroy the independence of these two stages and ignore the fact that by creating a first stage presumption but not a second stage presumption, Congress obviously intended for there to be no such presumption in the second stage.
 
 
 67
 Finally, applying the presumption in the second stage could open the door to fraud in the preparation of medical bills. If the miner no longer has to prove that his bills are related to pneumoconiosis, his doctor is no longer required to show the relation between the treatment and the pneumoconiosis. This would allow the possibility that doctors could prescribe unrelated treatment, indicate that it is related to pneumoconiosis, and fraudulently obtain payment for such treatment by way of the Doris Coal presumption.[12] While the employer/carrier would of course still have the opportunity to rebut the presumption, the employer is not in as good a position to obtain such evidence as is the treating doctor.
 
 
 68
 For all of the foregoing reasons, we hold that the Fourth Circuit Doris Coal presumption is inconsistent with the law of the Sixth Circuit. Even though we find that it withstands scrutiny under Greenwich Collieries, it still runs afoul of the purposes of the Black Lung Benefits Act, and is for that reason inconsistent with the law of this Circuit.
 
 
 69
 5. Because the ALJ below relied on the Doris Coal presumption, which we find to be inconsistent with the law of the Sixth Circuit, the case must be remanded to the ALJ for a determination according to the proper standard governing a second stage medical bill dispute.
 
 
 70
 The ALJ's examination of the medical evidence in this case was made under the assumption that Fourth Circuit law governed. Due to the fact that we find the Fourth Circuit law to be inconsistent with the law of the Sixth Circuit, we cannot affirm the decision made below. Further, we cannot independently evaluate the ALJ's findings of fact with regard to the doctors' reports, since the ALJ's review of them was guided by the burden shifting of the Doris Coal presumption. To affirm the ALJ's decision, despite the different legal standard applied below would require impermissible appellate fact finding. Therefore, the appropriate remedy here is a remand to the ALJ for review under the appropriate standard for the Sixth Circuit.
 
 
 71
 The proper standard in a second stage dispute concerning payment of medical bills under the Black Lung Benefits Act places the burden of proof on the claimant to prove his claim by a preponderance of the evidence. The burden of production is similarly on the claimant to offer evidence that the treatment is related to his totally disabling pneumoconiosis. The operator can offer evidence that the bills are not related to pneumoconiosis, but the operator cannot offer evidence controverting the miner's pneumoconiosis at this second stage because the determination of whether he has pneumoconiosis is made at the first stage.
 
 
 72
 The question then becomes what constitutes being "related to" pneumoconiosis. 20 C.F.R. § 725.701(b) requires that "[a] responsible operator ... shall furnish a miner entitled to benefits under this part with such [treatment] as the nature of the miner's pneumoconiosis and ancillary pulmonary conditions and disability require." (emphasis added). The Secretary argues that "ancillary" means "unrelated," and that "pneumoconiosis and ancillary pulmonary conditions" effectively means any and all pulmonary disease. We disagree. The word "ancillary" necessarily indicates some connection and relatedness, and usually a subordinate one.
 
 
 73
 This definition could be met by simple synergy (i.e., another pulmonary disease that combines with pneumoconiosis to cause a sum of disease greater than the two parts), or by relatedness (i.e., another pulmonary disease that would be either absent or significantly less virulent but for the pneumoconiosis). If, however, the connection is only that both diseases affect the lungs, the other condition simply is not "ancillary." Defining "ancillary" negatively, if it can be said that a condition causes a disability that would be exactly the same even if there were no pneumoconiosis (as Dr. Branscomb said was the case for Seals), then that other condition cannot be said to be ancillary to the pneumoconiosis.
 
 
 74
 The decision of the ALJ is VACATED and the case REMANDED to the ALJ for a determination of Petitioners' liability for the medical bills in dispute under the proper standard set forth above.
 
 
 75
 BOGGS, Circuit Judge, concurring in the judgment.
 
 
 76
 I agree with the court's determination that the Doris Coal presumption does not apply in this circuit, and that we should remand the case. However, I write separately to voice my disagreement with the dissent's analysis, and to express some divergence from Judge Dowd's analysis.
 
 
 77
 * Judge Dowd's opinion asks whether Doris Coal shifts only the burden of production or also the burden of persuasion, and whether Doris Coal is consistent with the Black Lung Benefits Act. I believe that this analysis is not required to determine that Doris Coal is inconsistent with the law of this circuit, and I would not perform it.
 
 
 78
 The ALJ and Board applied the Doris Coal presumption because they thought that Fourth Circuit law applied to this case, not because they thought Doris Coal was the law of this circuit. In general, an application of incorrect law requires a remand. See Cal-Glo Coal Co. v. Yeager, 104 F.3d 827, 830-31 (6th Cir.1997).
 
 
 79
 There are two reasons that we might affirm the Board rather than remand the case. First, we could find that the legal error is harmless, if the record would compel the same result even under the correct legal standard. See Sierra Club v. Slater, 120 F.3d 623, 637 (6th Cir.1997). Judge Dowd properly rejects this option.
 
 
 80
 Second, we could decide that Doris Coal is the law of the Sixth Circuit--that is, that the ALJ and Board did not use the wrong legal standard after all. The law of this circuit, however, is clear and simple and looks nothing like Doris Coal. Judge Dowd provides the correct standard. We have never articulated a contrary one. Indeed, there is no reason to conclude that the ALJ and Board would have held otherwise had they known that this case would be appealed to the Sixth Circuit. Therefore, this case must be remanded for an application of the proper legal standards, as spelled out by Judge Dowd in the final section of his opinion.
 
 
 81
 Although I would not cover as much ground as Judge Dowd to determine why we must remand this case, I do agree with his exposition of the proper legal standard, and so I concur in that portion of his opinion.
 
 II
 
 82
 * The dissent disagrees with our conclusion that "ancillary" requires synergy or relatedness, and defers to the Secretary's definition, which requires only that the ancillary condition contribute to the total pulmonary disability. To the dissent, "ancillary" would therefore mean only "additional" or "other."
 
 
 83
 The dissent is correct that we should ordinarily defer to an agency's reasonable interpretation of its own ambiguous regulations. The dissent is incorrect, however, that this is an ambiguous regulation. Cf. Frederick Schauer, Easy Cases, 58 S. CAL. L.REV. 399, 420 (1985) ("Ever since Macbeth mistakenly relied on the linguistic precision of the witches' prophesy, people have been able to construct weird and fanciful instances in which even the clearest language breaks down."). "Ancillary" has a reasonably clear meaning, and that meaning is not "everything else, connected or not." It requires some relatedness or subordinate connection.[1] Even the dictionary definitions offered by the dissent, when read in proper context, show this.
 
 B
 
 84
 The dissent is also incorrect that the Secretary's interpretation of its regulation is reasonable. One claim that the dissent makes in favor of the Secretary's interpretation is a "mere surplusage" argument. The dissent notes that pneumoconiosis is defined as including "respiratory or pulmonary impairment significantly related to, or aggravated by, dust exposure in coal mining employment." 30 U.S.C. § 902(b). Thus, the dissent contends, pneumoconiosis already includes related conditions, and so interpreting "ancillary" to mean "related" in "pneumoconiosis and ancillary pulmonary conditions" renders "ancillary" mere surplusage. There are two fundamental flaws with this argument.
 
 
 85
 First, the dissent overlooks the word "significantly" and the connection to coal dust required in § 902(b). A condition that (1) emerged long after the patient's exposure to coal dust ended, or (2) is insignificantly related to coal dust, but combines with pneumoconiosis to produce a synergistically greater detriment, would not meet the legal definition of pneumoconiosis, but would be "ancillary." Therefore, there is no surplusage problem.
 
 
 86
 Second, even if, arguendo, there were a surplusage problem with the proper interpretation of ancillary, the dissent's position would render even more substantial language surplus. If ancillary means "any other pulmonary condition," then "pneumoconiosis and ancillary pulmonary conditions" simply means "pulmonary conditions," and both "pneumoconiosis" and "ancillary" are rendered mere surplusage. Therefore, the Secretary's interpretation are not reasonable. It is not just that the Secretary's position is wrong, it is that it is not logically and linguistically defensible.
 
 C
 
 87
 The second piece of support the dissent offers for its deference is that this circuit has recently adopted the "aggravation rule." The dissent properly states the rule, which compensates some conditions that are largely unrelated to an employment injury: When an employment injury aggravates, accelerates, or combines with a preexisting impairment to produce a disability greater than that which would have resulted from the employment injury alone, the entire resulting disability is compensable. Morehead Marine Services, Inc. v. Washnock, 135 F.3d 366, 371 (6th Cir.1998). Despite its name, the rule requires only addition to the preexisting condition, not exacerbation or aggravation of it. See Port of Portland v. Director, OWCP, 932 F.2d 836, 839 (9th Cir.1991). On its face, this would undermine the principles I have set out above. Things are not, however, so simple.
 
 
 88
 First of all, it is not clear that the aggravation rule applies to black lung cases in general, or to this case in particular. The dissent is correct that this circuit recently used the aggravation rule in a case concerning the Longshore and Harbor Workers' Compensation Act (LHWCA). The dissent is also correct that the Black Lung Benefits Act generally incorporates the LHWCA. See 30 U.S.C. § 932(a). It is less clear, however, that the aggravation rule itself applies to the Black Lung Benefits Act. For one thing, no court has ever applied the rule to a black lung case. For another, the Black Lung Benefits Act's incorporation of the LHWCA specifically excludes those things "otherwise provided in this subsection or by regulations of the Secretary." 30 U.S.C. § 932(a). Therefore, the aggravation rule does not apply if it is inconsistent with regulations such as 30 C.F.R. § 725.701(b). Finally, even if the aggravation rule applies to this case, it only applies to preexisting conditions--Seals would still bear the burden of showing that the unrelated condition causing his symptoms pre-existed his pneumoconiosis.
 
 
 89
 To summarize, then, the current law and regulations charge Glen Coal for expenses from Seals's pneumoconiosis and from related or synergistic pulmonary conditions. If (and only if) the aggravation rule applies to black lung cases, Glen Coal must also pay expenses stemming from preexisting pulmonary conditions.
 
 D
 
 90
 Finally, I disagree with the dissent's contention that a Doris Coal-type presumption would be acceptable if used by a Department of Labor ALJ and affirmed by the Board and this court.
 
 
 91
 The dissent suggests that an ALJ could "develop a record as to whether to support a Doris Coal-like presumption and to decide whether or not to utilize such a presumption." Eventually, the dissent says, this court could use the resulting record to "approve or create such a presumption." Diss. Op. at 521. The dissent notes, correctly, that Greenwich Collieries does not foreclose the use of all non-statutory presumptions. But the creation of such a presumption is either the job of the Secretary, through a reasonable interpretation of an ambiguous regulation, see Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 696-99, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991), or through (preferably) promulgating a new regulation; or of an Article III court, through its interpretation of the statutes and regulations.
 
 
 92
 I agree with the dissent (and disagree with Judge Dowd) that it would not necessarily contravene Greenwich Collieries for the Secretary to adopt a regulation shifting the burden of production in the manner of Doris Coal. The dissent is wrong, however, in implying that there is any basis for an ALJ to do so. Cf. Malcomb v. Island Creek Coal Co., 15 F.3d 364, 367 n. 2 (4th Cir.1994) (explaining why Board is not entitled to deference for its interpretation of substantive standards). The job of the ALJ is to apply the law to the facts, drawing reasonable inferences along the way; the ALJ is not supposed to add to the law, however compelling or well-grounded the addition may be, and we should not "approve" an ALJ who does so. Furthermore, I do not believe that we should be in the business of "creating" presumptions, unless doing so is required by the applicable statute, regulations, or agency interpretations of ambiguous regulations. The dissent's suggestions to the contrary are unprecedented and unfounded. The dissent is correct that under the facts of a particular case, an ALJ might find it difficult to disentangle the various conditions contributing to lung disease. In a particular case, though, this difficulty is just as likely to make it easier for a claimant to make his case as it is to make it harder. Indeed, it is not necessary to shift any legal presumptions for the claimant to benefit from this complication. In this case, for instance, two of Seals's doctors testified that the treatment in question was related to Seals's pneumoconiosis--they did not abstain from deciding on grounds that the question was too difficult to sort out. Therefore, there could be substantial evidence to rule in Seals's favor even under the proper standard, though we leave this determination to the ALJ.
 
 III
 
 93
 For the foregoing reasons, I concur in the judgment of the court remanding this case to the Board.
 
 
 94
 MOORE, Circuit Judge, concurring in part and dissenting in part.
 
 
 95
 The Supreme Court very recently reiterated its well-established view that a reviewing court must accord substantial deference to an agency's interpretation of its own regulations where the interpretation is neither irrational nor an impermissible construction of the enabling statute. See Allentown Mack Sales and Serv., Inc. v. NLRB, 522 U.S. 359, 118 S.Ct. 818, 828, 139 L.Ed.2d 797 (1998) (National Labor Relations Board/National Labor Relations Act). In the instant appeal before this court, the Director, Office of Workers' Compensation Programs, United States Department of Labor,[1] (the "Director" or the "Agency") advanced two alternative legal standards for evaluating the extent of an employer's liability for medical expenses incurred by an employee who has already been found to be entitled to medical benefits under the Black Lung Benefits Act.[2] Besides arguing that a Doris Coal-like presumption, see Doris Coal Co. v. Director, OWCP, U.S. Dep't of Labor, 938 F.2d 492, 496 (4th Cir.1991), would be entirely consistent with the policies underlying the Act, the Director has stressed its view that such a presumption is, in any event, unnecessary since under 20 C.F.R. § 725.701(b), an employer/operator who has already been found at the first stage to be liable for a miner's total disability due to pneumoconiosis will be responsible at the second stage for the medical treatment of all pulmonary conditions contributing secondarily to the total respiratory disability of the claimant, whether or not such pulmonary conditions are otherwise related to or aggravated by the pneumoconiosis. Because I believe this court should defer to the Agency's reasonable interpretation of its own regulations, I must respectfully dissent.
 
 I. DEFERENCE
 
 96
 Pursuant to the Supreme Court's decision in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), it is well-settled that "[w]hen Congress, through express delegation or the introduction of an interpretive gap in the statutory structure, has delegated policy-making authority to an administrative agency, the extent of judicial review of the agency's policy determinations is limited." Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 696, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991) (Secretary of Labor/Black Lung Benefits Act). Here, the statutory language does not expressly define the exact scope of employer/operator liability for medical expenses but rather delegates broad discretion to the Secretary of Labor to promulgate "additional provisions, not inconsistent with those specifically excluded by this subsection, as he deems necessary to provide for the payment of benefits by such operator to persons entitled thereto as provided in this part." 30 U.S.C. § 932(a); see also 30 U.S.C. § 936 (providing the Secretary of Labor and the Secretary of Health and Human Services with authorization to issue such regulations as each deems appropriate to carry out the provisions of the subchapter comprising the Act); see generally 30 U.S.C. §§ 931-945 (Part C of the Act). The regulations promulgated by the Agency require that a "responsible operator [or] other employer ... furnish a miner entitled to benefits under this part with such medical, surgical, and other attendance and treatment, nursing and hospital services, medicine and apparatus, and any other medical service or supply, for such periods as the nature of the miner's pneumoconiosis and ancillary pulmonary conditions and disability require." 20 C.F.R. § 725.701(b) (emphasis added). The Agency interprets this provision as requiring a responsible operator or other employer to pay for the cost of treating not only pneumoconiosis, but also any ancillary pulmonary conditions and the resulting pulmonary disability. The Agency further explains that an "ancillary" pulmonary condition is a pulmonary condition that is unrelated to pneumoconiosis except to the extent that it contributes, along with the pneumoconiosis, to the total pulmonary disability. Petitioners Glen Coal Company and Old Republic Insurance Company (together the "Company"), on the other hand, contend that an "ancillary" pulmonary condition must be one that is aggravated by or related to the pneumoconiosis in some other meaningful way besides merely contributing, along with the pneumoconiosis, to the total pulmonary disability.[3]
 
 
 97
 This court must give deference to an agency's interpretation of its own regulations unless the interpretation is unreasonable or irrational. See Pauley, 501 U.S. at 696, 111 S.Ct. 2524; Sharondale Corp. v. Ross, 42 F.3d 993, 998 (6th Cir.1994). The term "ancillary" is not defined in either the regulations or the statute, and its exact meaning as used in 20 C.F.R. § 725.701(b) is uncertain from the plain language of this regulatory provision. Medical dictionaries define "ancillary" to mean "auxiliary, accessory, or secondary." See STEDMAN'S CONCISE MEDICAL DICTIONARY 49 (2d ed.1994); INTERNATIONAL DICTIONARY OF MEDICINE AND BIOLOGY 115 (1986) ("subordinate; auxiliary; supporting"); see also RANDOM HOUSE UNABRIDGED DICTIONARY 76 (2d ed.1993) (defining "ancillary" to mean: "1. subordinate; subsidiary. 2. auxiliary; assisting"). It is thus uncertain whether the pulmonary conditions "ancillary" to the pneumoconiosis referred to in 20 C.F.R. § 725.701(b) must not only have contributed, along with the pneumoconiosis, to the total pulmonary disability in an auxiliary, accessory, subordinate and/or secondary capacity but also have been aggravated by or otherwise related to the pneumoconiosis itself. Therefore, while the Company's interpretation is a plausible one, the plain language of the regulation is ambiguous and certainly allows for the Agency's interpretation.
 
 
 98
 The Agency's interpretation also seems reasonable as a matter of regulatory construction. "Pneumoconiosis" is defined by the Act to be "a chronic dust disease of the lung and its sequelae,[4] including respiratory and pulmonary impairments, arising out of coal mine employment." 30 U.S.C. § 902(b) (emphasis added). The regulations clarify that "a disease 'arising out of coal mine employment' includes any chronic pulmonary disease resulting in respiratory or pulmonary impairment significantly related to, or aggravated by, dust exposure in coal mine employment." 20 C.F.R. § 727.202 (emphasis added). Under this legal definition established by the statute and the regulations, a pulmonary condition resulting from, aggravated by, or otherwise significantly related to pneumoconiosis would itself also be considered pneumoconiosis. Therefore, as the Agency has explained, it is most likely that the term "ancillary pulmonary condition" is referring to a pulmonary condition unrelated to pneumoconiosis or to dust exposure in coal mine employment except that it contributes, along with the pneumoconiosis, to the claimant's total pulmonary disability. Otherwise the term "ancillary pulmonary conditions" would become surplusage. As a basic principle of regulatory construction, a court should strive to avoid interpretations that would lead to terms being mere surplusage, a result which presumably would not have been intended by the drafting party. See Wisconsin Public Intervenor v. Mortier, 501 U.S. 597, 613, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991).
 
 
 99
 To summarize, under the Agency's interpretation, a company found liable at the first stage for a miner's pneumoconiosis will be responsible at the second stage for medical treatment of the pneumoconiosis (which by definition includes all pulmonary conditions aggravated by, resulting from, or significantly related to the pneumoconiosis) as well as those pulmonary conditions which contribute, along with the pneumoconiosis, to the miner's total pulmonary disability (i.e., any ancillary pulmonary conditions).
 
 
 100
 This is not a case where "the statute simply will not bear the meaning the [agency] has adopted." Pittston Coal Group v. Sebben, 488 U.S. 105, 113, 109 S.Ct. 414, 102 L.Ed.2d 408 (1988) (reaching this conclusion with respect to the Secretary's interpretation of the term "criteria" as used in the Act which mandated that the criteria applied by the Secretary of Labor not be more restrictive than the criteria applicable under the interim HEW regulation). As this court previously noted in Sharondale, "the Act is remedial legislation that should be liberally construed so as to include the largest number of miners within its entitlement provisions." Id., 42 F.3d at 996 (quotation omitted).
 
 
 101
 Moreover, those miners whose medical expenses are at issue in this case have already been determined to be totally disabled due at least partially to pneumoconiosis and thus entitled to benefits under the Act. The Agency asserted at oral argument that only a very small percentage of those claimants who apply for black lung benefits under the Act ever pass the first stage. Whether an employer who has already been found liable at the first stage for an employee's pneumoconiosis should be responsible for the cost of treating pulmonary conditions that may not be directly related to the pneumoconiosis but are related to the total pulmonary disability is a determination that would logically depend heavily on scientific/medical expertise and policy judgments. According to the Director, "[t]he policy reason underlying broad coverage is simple: each person has only one set of lungs, and it is difficult, if not impossible, to separate the effects of various assaults on the lungs, or conversely, to determine the synergy or interrelationship between these assaults." Respondents' Br. at 23. The Act creates a "complex and highly technical regulatory program," see Pauley, 501 U.S. at 697, 111 S.Ct. 2524, and the agency charged with administering the Act is certainly in a better position than the courts to know how far medical science has advanced in understanding black lung disease and whether physicians have the capability of determining how one pulmonary condition may impact on and affect the treatment of another condition involving the same system of the body and of parsing out the various effects of different pulmonary conditions.
 
 
 102
 Seals's claim is governed by the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901-950, which is incorporated by reference into Part C of the Black Lung Act pursuant to 30 U.S.C. § 932(a), and the Company argues that requiring employers to pay for the treatment of pulmonary conditions unrelated to pneumoconiosis even though they contribute, along with the pneumoconiosis, to the claimant's total pulmonary disability would be contrary to the LHWCA which intends to render employers liable only for employment-related injuries. Petitioners' Reply Br. at 7-8. I disagree that under the LHWCA employers can only be held responsible for medical treatment of conditions/injuries that are themselves employment-related. The Sixth Circuit's recent adoption of the aggravation rule with respect to pre-existing conditions serves as a good example of a situation where an employer is held responsible for treatment of conditions that are employment-related only to the extent that the condition combines with an employment-related injury and contributes to producing disability.
 
 
 103
 The Company is correct that under the LHWCA an employer is obligated to "furnish such medical, surgical, and other attendance or treatment ... for such period as the nature of the injury or the process of recovery may require" and that the term "injury" is defined by the statute to mean an "accidental injury or death arising out of and in the course of employment." 33 U.S.C. §§ 907(a), 902(2) (emphasis added). However, in determining what medical expenses are compensable under the LHWCA, several circuits, including the Sixth Circuit, follow the aggravation rule--a general workers' compensation doctrine providing that "when an 'employment injury aggravates, accelerates, or combines with a preexisting impairment to produce a disability greater than that which would have resulted from the employment injury alone, the entire resulting disability is compensable.' " Morehead Marine Servs., Inc. v. Washnock, 135 F.3d 366, 371 (6th Cir.1998) (quoting Port of Portland v. Director, OWCP, 932 F.2d 836, 839 (9th Cir.1991)) (emphasis added); see also Director, OWCP v. Bath Iron Works Corp., 129 F.3d 45, 50 (1st Cir.1997); Director, OWCP v. Ingalls Shipbuilding, Inc., 125 F.3d 303, 306 (5th Cir.1997); Director, OWCP v. Luccitelli, 964 F.2d 1303, 1304 (2d Cir.1992); SAIF Corp./Oregon Ship v. Johnson, 908 F.2d 1434, 1441 (9th Cir.1990) (explaining that under the aggravation doctrine, an employer must fully compensate an employee whose employment-related injury aggravates a preexisting injury in the sense that it combines with the preexisting injury to produce disability). The logic behind the aggravation rule is akin to the common law doctrine that a tortfeasor takes his victim as he finds him. See Ingalls Shipbuilding, 125 F.3d at 306. Thus, an LHWCA claimant whose respiratory disability results partially from employment-related asbestos exposure and partially from unrelated obstructive pulmonary conditions caused by obesity and smoking would nevertheless be compensated for the treatment of all of these conditions. See, e.g., Bath Iron Works, 129 F.3d at 53; SAIF Corp., 908 F.2d at 1441. In light of this background, the Agency's interpretation of 20 C.F.R. § 725.701(b) is neither extraordinary nor novel as a matter of policy judgment. In fact, the Agency's interpretation seems perfectly consistent with other established principles under the LHWCA like the aggravation rule and long-held doctrines of workers' compensation law. In sum, the Agency's interpretation of 20 C.F.R. § 725.701(b) is neither irrational nor unreasonable. Moreover, since "[t]here is simply no reason to suspect that the interpretation does not reflect the [A]gency's fair and considered judgment on the matter in question," the fact that the interpretation may be a litigating position does not reduce the amount of deference that we must give it. Auer v. Robbins, 519 U.S. 452, 117 S.Ct. 905, 912, 137 L.Ed.2d 79 (1997); see also Martin v. OSH Review Comm'n, 499 U.S. 144, 157, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991); Lovilia Coal Co. v. Harvey, 109 F.3d 445, 452 (8th Cir.1997). Accordingly, I would defer to the Agency's interpretation of its own regulation.[5]
 
 II. REBUTTABLE PRESUMPTION
 
 104
 I also do not believe we should reject outright the Doris Coal presumption, specifically that "when a miner receives treatment for a pulmonary disorder, a presumption [should arise] that the disorder was caused or at least aggravated by the miner's pneumoconiosis...." Doris Coal, 938 F.2d at 496. The record before this court does not contain sufficient evidence on which either to accept or reject the adoption or creation of a Doris Coal-like presumption. Since the administrative law judge ("ALJ") tried this case believing he was bound by the Fourth Circuit's ruling in Doris Coal, it is not surprising that he saw no need to develop or pursue this issue at trial. In the absence of an alternative basis for ruling, I would remand this case to the ALJ for a determination of whether a scientific or evidentiary basis exists to support such a presumption. The ALJ may find, for example, that scientific proof exists that "most pulmonary disorders are going to be related [to] or at least aggravated by the presence of pneumoconiosis," as the Fourth Circuit in Doris Coal believed to be true. Id., 938 F.2d at 496. A finding that such interrelationships can rarely be confirmed or rebutted with any certainty by present medical technology might also serve as an evidentiary basis for our relying on such a presumption.
 
 
 105
 On remand the ALJ will have the opportunity to develop a record as to whether an evidentiary basis exists to support a Doris Coal-like presumption and to decide whether or not to utilize such a presumption. The Benefits Review Board would then determine whether or not to affirm the ALJ's decision. Certainly as with other such decisions, this decision would be appealable to this court, which would then review under the appropriate standards to determine whether to approve or create such a presumption.
 
 
 106
 On appeal to this court, I see no reason why despite such findings, the Act itself would stand as an obstacle to our judicially creating such a presumption. While uniformity may indeed have been one goal of the Act, I agree with Judge Boggs that reading Director, OWCP v. Greenwich Collieries, 512 U.S. 267, 114 S.Ct. 2251, 129 L.Ed.2d 221 (1994), as mandating a prohibition of all non-statutory presumptions is overly broad and unwarranted. As explained in 1 STEPHEN A. SALTZBURG ET AL., FEDERAL RULES OF EVIDENCE MANUAL 163-64 (7th ed.1998), "[c]ourts can and have created and applied presumptions as a matter of federal common law when necessary to further congressional policy (i.e., when Congress would have wanted a presumption created)."
 
 
 107
 A Doris Coal-like presumption would be wholly consistent with the remedial purposes of the Act and the principles on which it was enacted and amended. The Senate Report that accompanied the passage of the Act in 1972, which broadened the definition of "pneumoconiosis," recognized the uncertain state of medical knowledge and the need to compensate for this uncertainty. See S.REP. NO. 92-743, at 9-11 (1972), reprinted in 1972 U.S.C.C.A.N. 2305, 2313-15; see also Adams v. Director, OWCP, 886 F.2d 818, 825 (6th Cir.1989) (noting the Act's concern with inflexible proof of causation requirements, as illustrated by the Act's reliance on rebuttable presumptions, as support for requiring only that a miner's pneumoconiosis be a partial cause of his total respiratory disability) (citing Southard v. Director, OWCP, 732 F.2d 66, 70-71 (6th Cir.1984)). In particular, the report noted the testimony of an acknowledged expert in the field of pulmonary impairments of coal workers:
 
 
 108
 Other conditions of the lung, in addition to [clinical] pneumoconiosis, are commonly encountered among coal miners. While the exact causes of these conditions are not completely understood and while other nonoccupational factors may be in part responsible, no medical authority can prove these conditions to be unassociated with the mining exposure.... [W]e do not know all of the specific disease entities which can arise as a consequence of the mining industry, we do not even know for that matter all of the specific causes of these impairments,....
 
 
 109
 S.REP. NO. 92-743, at 10-11 (1972), reprinted in 1972 U.S.C.C.A.N. 2305, 2314-15. The report concluded that "[i]n the absence of definitive medical conclusions there is a clear need to resolve doubts in favor of the disabled miner or his survivors." S.REP. NO. 92-743, at 11 (1972), reprinted in 1972 U.S.C.C.A.N. 2305, 2315.
 
 
 110
 Some well-established reasons for creating a presumption include: (1) the high probability that the presumed fact follows from the basic facts, (2) access to proof, (3) procedural convenience, and (4) social and economic policy reasons. See CHARLES ALAN WRIGHT AND KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 5122, at 569-70 (1977 & Supp.1997). Thus, while I agree with Judge Dowd that the likelihood of fraud is an important consideration to take into account in evaluating the wisdom of reliance on a presumption, the danger of fraud is but one factor that should be weighed and can be properly evaluated only when a complete evidentiary record is available to this court.
 
 III. CONCLUSION
 
 111
 To the extent that the majority fails to accord proper deference to the Agency's reasonable interpretation of 20 C.F.R. § 725.701(b) as rendering the Company liable for the medical treatment of all pulmonary conditions contributing, along with pneumoconiosis, to Seals's total respiratory disability whether or not such conditions are otherwise related to Seals's pneumoconiosis, I respectfully dissent. I also note my disagreement with any outright rejection of the Doris Coal presumption without first remanding the case to the ALJ so that a record can be developed as to whether a sufficient evidentiary/medical basis exists for our adopting such a standard. I concur with the majority's opinion to the extent that it is not inconsistent with the views that I have expressed.
 
 
 
 *
 The Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation
 
 
 [1]
 Part C incorporated by reference substantial parts of the Longshore and Harborworkers' Compensation Act ("LHWCA"). 33 U.S.C. §§ 901-950 incorporated by reference into 30 U.S.C. § 932(a). See Director, Office of Workers' Compensation Programs v. Eastern Coal Corp., 561 F.2d 632 (6th Cir.1977)
 The LHWCA provides that the responsible employer or its insurance carrier must pay the cost of medical care needed by the worker as a result of any occupationally related injury or disease that is otherwise compensable. 33 U.S.C. § 907 ("Section 7"). Section 7 of the LHWCA was not originally incorporated into the Black Lung Act, but was added in the Black Lung Benefits Act of 1972. Pub.L. 92-303, § 5(b)(9), 86 Stat. 156 (1972). Thereafter, a Part C beneficiary could obtain health care benefits for the treatment of pneumoconiosis. The DOL's Part C regulations allowed a Part B beneficiary to "refile" for Part C benefits (subject to an offset by whatever Part B benefits were payable). 38 Fed.Reg. 26,045; 20 C.F.R. § 725.102(a) (1973) (repealed). Some Part B beneficiaries could, therefore, obtain Part C medical benefits under the 1972 Act. Most of these "refilings" would, however, have been barred by the then applicable statute of limitations. 38 Fed.Reg. 26,046; 20 C.F.R. § 725.124 (1973) (repealed).
 When Congress was again considering comprehensive amendments to the Black Lung Act in the late 1970s, it added a new provision allowing all Part B miner/beneficiaries to apply for medical benefits with the DOL under Part C. Any applicable statute of limitations would be waived if the claim for medical benefits was filed within a specific period after the Part B beneficiary was notified by the Secretary of HEW of a right to file a medical benefits claim. Pub.L. 95-239, § 11, 92 Stat. 101 (1978) (codified at 30 U.S.C. § 924(a)). Claims of this sort are commonly called "medical benefit only" or "MBO" claims. In implementing section 11 of the 1978 amendments, the DOL wrote regulations governing MBO claims, and medical benefit entitlements generally. 20 C.F.R. §§ 725.701-725.707 (1996).
 
 
 [2]
 One of the following medical requirements must be met:
 (1) A chest roentgenogram (X-ray), biopsy, or autopsy establishes the existence of pneumoconiosis (see § 410.428 of this title);
 (2) Ventilatory studies establish the presence of a chronic respiratory or pulmonary disease (which meets the requirements for duration in § 410.412(a)(2) of this title) as demonstrated by values which are equal to or less than the values specified in the following table: [table omitted];
 (3) Blood gas studies which demonstrate the presence of an impairment in the transfer of oxygen from the lung alveoli to the blood as indicated by values which are equal to or less than the values specified in the following table: [table omitted];
 (4) Other medical evidence, including the documented opinion of a physician exercising reasoned medical judgment, establishes the presence of a totally disabling respiratory or pulmonary impairment;
 (5) In the case of a deceased miner where no medical evidence is available, the affidavit of the survivor of such miner or other persons with knowledge of the miner's physical condition, demonstrates the presence of a totally disabling respiratory or pulmonary impairment.
 
 
 [20]
 C.F.R. § 727.203(a)
 
 
 [3]
 The presumption is rebutted if:
 (1) The evidence establishes that the individual is, in fact, doing his usual coal mine work or comparable and gainful work (see § 410.412(a)(1) of this title); or
 (2) In light of all relevant evidence it is established that the individual is able to do his usual coal mine work or comparable and gainful work (see § 410.412(a)(1) of this title); or
 (3) The evidence establishes that the total disability or death of the miner did not arise in whole or in part out of coal mine employment; or
 (4) The evidence establishes that the miner does not, or did not, have pneumoconiosis.
 
 
 [20]
 C.F.R. § 727.203(b)
 
 
 [4]
 "[A]ny drug that causes relaxation of bronchial muscle resulting in expansion of the air passages of the bronchi." Webster's Third International Dictionary 282 (1981)
 
 
 [5]
 The ALJ applied Fourth Circuit law because at the time the matter arose, Seals was living and receiving medical treatment in Virginia. However, as noted above, the injury resulted from Seals' coal mine work in Kentucky, which required the subsequent transfer of this case to this Court
 
 
 [6]
 "COPD" is an acronym for "chronic obstructive pulmonary disease," which includes asthma, chronic bronchitis, certain types of emphysema and other conditions
 
 
 [7]
 "[O]bligation which rests on one of the parties to an action to persuade the trier of the facts, generally the jury, of the truth of a proposition which he has affirmatively asserted by the pleadings." Greenwich Collieries, supra, 114 S.Ct. at 2256 (quoting W. Richardson, Evidence 143 (6th ed.1944))
 
 
 [8]
 "[A] party's obligation to come forward with evidence to support its claim." Greenwich Collieries, supra, at 2255
 
 
 [9]
 See definition of "burden of proof" supra note 7
 
 
 [10]
 See definition of "burden of production" supra note 8
 
 
 [11]
 See definition of "burden of proof" supra note 7
 
 
 [12]
 Petitioners suggest that this has already happened in many instances
 
 
 [1]
 Parenthetically, it is worth noting (though it is not dispositive) that "ancillary" is derived from the Latin word ancilla, which means "handmaid." 1 OXFORD ENGLISH DICTIONARY 447 (2d ed.)
 
 
 [1]
 The Director, as designee of the Secretary of Labor, see 20 C.F.R. § 701.202(f), "is vested with [the] authority to administer the Black Lung Benefits Act." Director, OWCP, U.S. Dep't of Labor v. Saulsberry, 887 F.2d 667, 670 (6th Cir.1989). Besides the federal respondent, claimant Jess Seals is also a respondent in this appeal
 
 
 [2]
 Title IV of the Federal Coal Mine Health and Safety Act of 1969, Pub.L. 91-173, 83 Stat. 792 (1969), as amended by the Black Lung Benefits Act of 1972, Pub.L. 92-303, 86 Stat. 150 (1972), and as further amended by the Black Lung Benefits Reform Act of 1977, Pub.L. 95-239, 92 Stat. 95 (1978), the Black Lung Benefits Revenue Act of 1977, Pub.L. 95-227, 92 Stat. 11 (1978); the Black Lung Benefits Revenue Act of 1981 and the Black Lung Benefits Amendments of 1981, Pub.L. 97-119, 95 Stat. 1635 (1981) (hereinafter together referred to as the "Act")
 
 
 [3]
 In other words, under the Company's interpretation pulmonary condition X could not be considered "ancillary" to the pneumoconiosis of a claimant if it merely combined with the pneumoconiosis to create total pulmonary disability, but could be considered "ancillary" if pulmonary condition X was also itself the result of or aggravated by the pneumoconiosis
 
 
 [4]
 "Sequelae" are "abnormal condition[s] resulting from a previous disease." See RANDOM HOUSE UNABRIDGED DICTIONARY 1747 (2d ed.1993); see also STEDMAN'S MEDICAL DICTIONARY 1407 (25th ed.1990) (sequelae are those "condition[s] following as a consequence of a disease")
 
 
 [5]
 While a proposed regulation codifying the Doris Coal presumption is currently under consideration by the Agency, such changes have not yet been formally adopted. See 62 Fed.Reg. 3338, 3369 (Jan. 22, 1997). At the present time, the Agency's position is that 20 C.F.R. § 725.701(b) renders employers liable for all pulmonary conditions that contribute to the claimant's total respiratory disability whether or not such conditions are otherwise related to the pneumoconiosis suffered by the claimant, and this present interpretation should be the focus of this court's analysis. The Agency certainly has the prerogative to change its policies in the future and to adopt the proposed regulation. After all, leaving such discretion to the agency charged with implementing a statute is the whole point of Chevron. See Lovilia Coal, 109 F.3d at 452 (concluding that a change in agency position is not invalidating unless it is arbitrary, capricious, or an abuse of discretion)