Jane F. GARVEY, Administrator, Federal Aviation Administration, Petitioner,

v.

NATIONAL TRANSPORTATION SAFETY BOARD and Richard Lee Merrell, Respondents.

No. 98–1365.

United States Court of Appeals, District of Columbia Circuit.

Argued April 8, 1999.

Decided Sept. 21, 1999.

cross-appeal as waived and direct that it be          dismissed.

E. Roy Hawkens, Attorney, U.S. Department of Justice, argued the cause for petitioner. With him on the briefs were Frank W. Hunger, Assistant Attorney General at the time the briefs were filed, David W. Ogden, Acting Assistant Attorney General, Robert S. Greenspan, Attorney, and James W. Tegtmeier, Attorney, Federal Aviation Administration.

Clay Warner argued the cause for respondents. With him on the brief was James W. Johnson.

Before: WALD, RANDOLPH and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge GARLAND:

GARLAND, Circuit Judge:

The Federal Aviation Administration (FAA) issued an enforcement order to Captain Richard Merrell, a Northwest Airlines pilot whom the FAA determined had violated airline safety regulations. Merrell appealed to the National Transportation Safety Board (NTSB), which ruled in his favor and dismissed the FAA's order. The FAA petitions for review of that decision, arguing that the NTSB erroneously failed to defer to the FAA's reasonable interpretation of its own regulations. We grant the petition, reverse the NTSB, and remand for further proceedings consistent with this opinion.

## I

The Federal Aviation Act, 49 U.S.C. §§ 40101 *et seq.*, establishes a "split-enforcement" regime in which the FAA has regulatory and enforcement authority, while the NTSB acts as an impartial adjudicator. *See Hinson v. NTSB*, 57 F.3d

1144, 1147 n. 1 (D.C.Cir.1995). We begin by setting forth the facts and procedural history of Captain Merrell's case, and then describe the nature of the split-enforcement regime in more detail.

## A

The facts of the case are undisputed. On June 19, 1994, Merrell was the pilot-in-command of a commercial passenger plane, Northwest Flight 1024. After Flight 1024 took off in the heavily trafficked Los Angeles area, air traffic control (ATC) instructed it to climb to and maintain an altitude of 17,000 feet. Merrell correctly repeated, or "read back," this instruction to ATC. About a minute later, ATC transmitted an altitude clearance to another aircraft, American Airlines Flight 94, directing it to climb to and maintain an altitude of 23,000 feet. The American flight promptly and correctly acknowledged this clearance with its own "readback."

Merrell, however, mistakenly thought that the instruction to American was intended for his aircraft, so he also read the instruction back to ATC. Unfortunately, because Merrell made his readback at the same time as the American pilot, his transmission was blocked, or "stepped on." The ATC radio system can handle only one transmission at a time on any given frequency; when two transmissions overlap, both may become blocked or garbled, or the stronger signal alone may be heard (i.e., it may "step on" the weaker signal). ATC can often detect that a transmission has been stepped on because, unless the signals overlap completely, ATC will receive a portion of the stepped-on message, and because a loud buzzing noise usually accompanies the period of overlap. On rare occasions, however, two transmissions will overlap completely without creating an identifiable buzz. This appears to have happened in Merrell's case. His readback apparently coincided precisely with that of

American Flight 94, and as a result his transmission was entirely blocked. ATC heard neither Merrell's readback nor any indication that it had occurred. And because ATC did not hear the erroneous readback, it could not correct Merrell's mistake.

Meanwhile Merrell, unaware that ATC had not received his transmission, proceeded to ascend toward 23,000 feet. As the Northwest flight rose from its assigned altitude, the ATC controller noticed the deviation and directed the aircraft to return to 17,000 feet. Before Merrell could comply, he had ascended to 18,200 feet and lost the standard safety separation required between commercial flights.

On November 3, 1995, the FAA issued an enforcement order against Merrell. The order alleged that Merrell had violated FAA safety regulations by, inter alia, (1) "operat[ing] an aircraft contrary to an ATC instruction in an area in which air traffic control is exercised," in violation of 14 C.F.R. § 91.123(b); and (2) "operat[ing] an aircraft according to a clearance or instruction that had been issued to the pilot of another aircraft for radar air traffic control purposes," in violation of 14 C.F.R. § 91.123(e). Joint Appendix (J.A.) at 7.[1]

Merrell appealed the FAA's order to the NTSB. At the outset of the proceedings, the FAA agreed that because Merrell had filed a timely incident report pursuant to the FAA Aviation Safety Reporting Program, it would waive any sanction for the alleged violations. *See* J.A. at 11. It sought affirmance of its enforcement order, however, arguing that Merrell had deviated from clearly transmitted ATC instructions, that this mistake was due to his own carelessness rather than to ATC error, and that the deviation therefore constituted a regulatory violation. The Administrative Law Judge (ALJ) agreed and

---

1. Merrell was also charged with "operat[ing] an aircraft in a careless manner so as to endanger the lives or property of others," in violation of 14 C.F.R. § 91.13(a). As dis-

cussed *infra* note 23, both parties appear to believe that the validity of this charge depends wholly upon the validity of the § 91.123 charges.

affirmed the order. The ALJ found, based on both the recording and the transcript of the radio communications, that the ATC transmission to American Flight 94 had been clear and that the instruction to climb to 23,000 feet had plainly not been intended for Merrell's aircraft. *Id.* at 14–15. Indeed, after Merrell listened to the tape, he conceded that he had simply "misheard" the instruction. *See id.* at 18–19; NTSB Record (R.) at 145. The ALJ concluded that the fact that Merrell's readback was stepped on did not absolve "Captain Merrell of his responsibility to hear that [the] initial clearance" was for another flight. J.A. at 26. He explained that: "[A]viation is ... particularly unforgiving of carelessness or neglect. And in this particular case, the initial mistake was made by Captain Merrell, and he's going to have to be responsible for it." *Id.* at 27. Accordingly, the ALJ held that Merrell "was in regulatory violation as alleged." *Id.*

Merrell appealed the ALJ's decision to the Board. He argued that under NTSB precedent, a pilot cannot be held responsible for an inadvertent deviation caused by ATC error. His had been such a deviation, he contended, because he had taken actions which, but for ATC, would have kept him from leaving his assigned altitude. He reasoned that because ATC controllers are required to correct erroneous readbacks,[2] his construction of ATC's silence as tacit confirmation had been reasonable and justified. In response, the FAA again argued that because the primary cause of the deviation had been Merrell's misperception of a clear instruction, his actions had violated the safety regulations. The FAA maintained that this outcome was consistent with Board precedent which, it contended, absolves pilots only when "ATC error is the initiating or primary cause of the deviation." R. at 321.

The NTSB accepted Merrell's arguments and dismissed the enforcement or-der. It found that Merrell had made only "an error of perception," and that there was "no evidence in the record ... that [he] ... was performing his duties in a careless or otherwise unprofessional manner." J.A. at 34. A "perception mistake," the Board said, does not always result from "a failure of attention," and therefore "careless inattention ... will not be automatically assumed in every case" in which a pilot mishears ATC instructions. *Id.* Moreover, there was no "failure of procedure" on Merrell's part, as he had "made a full readback so that the opportunity was there, absent the squelched transmission, for ATC to correct his error." *Id.* at 35.

The FAA then petitioned the Board for reconsideration of its decision. R. at 360–81. The agency argued that the Federal Aviation Act requires the Board to defer to the FAA's reasonable interpretation of its own safety regulations. In the FAA's view, 14 C.F.R. § 91.123 obligates pilots "to listen, hear, and comply with all ATC instructions except in an emergency." *Id.* at 366; *see id.* at 362. "Inattention, carelessness, or an unexplained misunderstanding," it said, "do not excuse a deviation from a clearly transmitted clearance or instruction." *Id.* at 367. "When there is an 'error of perception' resulting in a deviation, inattentiveness or carelessness are imputed in the absence of some reasonable explanation for the failure to comply with the ATC clearance." *Id.* According to the FAA, reasonable explanations include events such as "radio malfunction" or a controller error that precipitates a misunderstanding, but "[t]o excuse [Merrell's] deviation in these circumstances as an acceptable, though unexplained, 'error of perception'" would be inconsistent with the agency's construction of § 91.123. *Id.* at 368–69; *see id.* at 369, 371. Moreover, the FAA argued that the Board's decision would have a "profound" negative effect on air safety: "Under the decision, airmen

---

2. The handbook of ATC rules and procedures states: "If altitude, heading or other items are read back by the pilot, ensure the readback is correct. If incorrect or incomplete, make corrections as appropriate." FEDERAL AVIATION ADMIN., U.S. DEP'T OF TRANSP., AIR TRAFFIC CONTROL ¶ 2-72 (1993) [hereinafter ATC PROCEDURES].

can claim, without further proof, that they did not hear or that they misperceived safety crucial instructions as a means to avoid responsibility for noncompliance or erroneous compliance with ATC clearances and instructions." *Id.* at 374.

The Board denied the petition for reconsideration. Although it acknowledged its "general obligation to defer to the FAA's validly adopted interpretation of its regulations," the Board considered itself under no such obligation in this case because "the FAA cites no rule *it* has adopted that stands for the proposition the FAA urges here." J.A. at 38. The Board further noted that the FAA offered "no evidence of *any* policy guidance written by the FAA, validly adopted or otherwise," to support its interpretation, and instead offered only "[c]ounsel's litigation statements." *Id.*

Because the Board determined that it was not required to defer to the FAA's interpretation, it followed its own view of appropriate aviation policy. It stated:

> We ... disagree with the FAA's underlying belief that our policy threatens aviation safety. The premise of our approach is this—human beings make mistakes, and there is no regulatory action, remedial or otherwise, that can eliminate all mistakes.... [W]here an inevitable error of perception does occur, the pilot should not face sanction if he has acted responsibly and prudently thereafter....

*Id.* Adhering to this principle, the NTSB announced the following rule:

> If a pilot makes a mistake and mishears a clearance or ATC direction, follows all prudent procedures that would expose the mistake (e.g., reads back the clearance), and then acts on that mistaken understanding having heard no correction from ATC, the regulatory violation will be excused if that mistake is not shown to be a result of carelessness or purposeful failure of some sort.

*Id.* at 37. The FAA then petitioned for review in this court.

**B**

Under the Federal Aviation Act's split-enforcement regime, Congress has delegated rulemaking authority to the FAA: "The Administrator of the Federal Aviation Administration shall promote safe flight of civil aircraft in air commerce" by prescribing, among other things, "regulations and minimum standards for ... practices, methods, and procedure the [FAA] finds necessary for safety in air commerce and national security." 49 U.S.C. § 44701(a). Pursuant to that authority, the FAA promulgated the safety regulations at issue here, 49 C.F.R. §§ 91.123(b), (e). Congress has also given the FAA authority to enforce its regulations through a number of methods, including the issuance of "an order amending, modifying, suspending, or revoking" a pilot's certificate if the public interest so requires. 49 U.S.C. § 44709(b). The FAA exercised that authority in issuing its enforcement order to Captain Merrell. *See* J.A. at 7.

Congress has assigned adjudicatory authority under this regime to the NTSB. *See generally* 49 U.S.C. § 1133. A pilot whose certificate is adversely affected by an FAA enforcement order may appeal the order to the NTSB. *See id.* § 44709(d)(1). Such an appeal is initially heard by an ALJ, *see* 49 C.F.R. § 821.35(a), whose final decision may be appealed to the full Board, *see id.* § 821.47(a). The Board's decision, in turn, may be reconsidered upon the petition of either party. *See id.* § 821.50. In reviewing an FAA order, "the Board is not bound by findings of fact of the [FAA] Administrator." 49 U.S.C. § 44709(d)(3). It is, however, "bound by all validly adopted interpretations of laws and regulations the Administrator carries out ... unless the Board finds an interpretation is arbitrary, capricious, or otherwise not according to law." *Id.*

▇ If dissatisfied with a final order of the Board, either the FAA Administrator or any "person substantially affected" may petition for review in this court. *Id.*

§§ 1153(c), 44709(f), 46110.[3] On judicial review, the "[f]indings of fact of the Board are conclusive if supported by substantial evidence." 49 U.S.C. § 44709(f); *id.* § 1153(c); *see also id.* § 46110(c). We must, however, set aside Board decisions if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).[4] And, like the NTSB, we must defer to the FAA's interpretations of its own aviation regulations. *Cf. Martin v. Occupational Safety & Health Review Comm'n,* 499 U.S. 144, 147, 150–57, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991) (holding that courts must defer to interpretations of Secretary of Labor rather than to those of OSHRC in split-enforcement regime under Occupational Safety & Health Act).

## II

■ As we have just described, Congress has "unambiguously direct[ed] the NTSB to defer to the FAA's interpretations of its own regulations." *Hinson,* 57 F.3d at 1148 n. 2 (citing 49 U.S.C. § 44709(d)(3)); *see also id.* at 1151. Here, however, the NTSB explicitly declined to defer to the agency's interpretation of 14 C.F.R. § 91.123. In this Part, we consider the argument that deference to the FAA was not required, either because its inter-

pretation was not validly adopted or because that interpretation was really a factual finding in disguise.

### A

■ The NTSB declined to defer to the FAA primarily because the agency had offered "no evidence of *any* policy guidance written by the FAA, validly adopted or otherwise," to support its interpretation. J.A. at 38. Instead, the agency had merely offered the "litigation statements" of FAA counsel, as well as citations to the Board's own case law. *See id.* The NTSB believed the former insufficient to qualify for Board deference under section 44709(d)(3). Accordingly, it rejected the FAA's interpretation and expressly adopted its own policy to govern cases like that of Captain Merrell.

■ The NTSB's refusal to defer to the FAA on this question of regulatory interpretation and air safety policy was error. The FAA is not required to promulgate interpretations through rulemaking or the issuance of policy guidances, but may instead do so through litigation before the NTSB. We have said as much before,[5] and the Supreme Court so held in *Martin v. Occupational Safety & Health Review Comm'n* with respect to the similar split-enforcement regime of the Occupational Safety & Health Act.[6] Indeed, the NTSB itself has repeatedly made the same point.[7]

---

**3.** Although this case is styled Administrator, FAA v. NTSB, the real parties in interest are the FAA and Captain Merrell. The situation is roughly analogous to an appeal from a district court: the NTSB (the adjudicator below) "has no direct stake in the outcome" and therefore does not have any role "as a party in judicial review proceedings." *Hinson,* 57 F.3d at 1147 n. 1.

**4.** *See generally Martin v. Occupational Safety & Health Review Comm'n,* 499 U.S. 144, 158, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991); *Hinson,* 57 F.3d at 1149–50; *Public Citizen, Inc. v. FAA,* 988 F.2d 186, 196–97 (D.C.Cir.1993). Prior to 1994, the text of the Federal Aviation Act mandated that judicial review of NTSB orders "be conducted in accordance with the provisions of" the Administrative Procedure Act (APA), including 5 U.S.C. § 706(2)(A). *See* 49 U.S.C. § 1903(d) (1994) (repealed 1994). In 1994, this provision was "omitted as unnecessary because [the APA] applies by

its own terms." H.R. Rep No. 103–180, at 18 (1993).

**5.** *See Hinson,* 57 F.3d at 1148–49, 1151 (stating that the FAA could assert its interpretations in litigation before the NTSB and that "the Board would then be required to defer").

**6.** *See Martin,* 499 U.S. at 157–58, 111 S.Ct. 1171 (holding that "the Secretary's litigating position before the Commission is as much an exercise of delegated lawmaking powers as is the Secretary's promulgation of a workplace health and safety standard," and that "the Secretary's interpretation is not undeserving of deference merely because the Secretary advances it for the first time in an administrative adjudication").

**7.** *See Petition of Quintana,* NTSB Order No. EA–3737 (1992), 1992 WL 362084, at *2 (noting that NTSB has previously recognized

The fact that this mode of regulatory interpretation necessarily is advanced through the "litigation statements" of counsel does not relieve the NTSB of its statutory obligation to accord it due deference.[8]

Nor was Merrell's the first case in which the FAA interpreted its regulations as it does here. The position the agency took in its petition for reconsideration can be summarized as follows: Failure to understand an ATC instruction is a valid defense to a section 91.123 charge only if the pilot provides some exculpatory explanation, such as radio malfunction or precipitating controller error. *See* R. at 371. That is precisely the position the FAA took before this court in *Hinson*—although there we refused to consider it because the agency had failed to raise it below. *See Hinson*, 57 F.3d at 1150–51. It is also the position the FAA has consistently taken in litigation before the Board. *See Administrator v. Gentile*, 6 N.T.S.B. 60, 64 (1988); *Administrator v. Wells*, 1 N.T.S.B. 1472, 1474 (1971). As discussed in Part IV, while the NTSB's own position has wavered over the years, the FAA's has not.

In sum, the NTSB's rationale for denying deference to the FAA's interpretation of 14 C.F.R. § 91.123 was unjustified.

"that rule interpretation may occur through adjudication"); *id.* at *3 (noting that the NTSB has "adopted and followed the principles discussed in *Martin v. OSHRC*"); *see also Petition of Van Eaton*, NTSB Order No. EA–4692 (1998), 1998 WL 546384, at *2 ("The FAA is entitled to make policy via adjudication. In such a case, the question for us would be whether the proposed policy conforms with the words of the regulation."); *Administrator v. Miller*, NTSB Order No. EA–3581 (1992), 1992 WL 137750, at *2–4 ("While the *evolutionary* interpretation of rules is thought to be better accomplished through the rulemaking process itself, there is little question that the adjudicatory process may also be used to develop and define the meaning of existing regulations.").

8. In *Martin*, the Supreme Court rejected the contention that according deference to agency litigating positions taken before an administrative adjudicator would be inconsistent with the Court's prior holdings denying deference

## B

Merrell offers another potential justification for the NTSB's failure to defer to the FAA. The FAA's position below was not truly an "interpretation," he argues, but rather a determination of fact with which the Board was free to disagree. As Merrell observes, the FAA's petition for reconsideration states: "When there is an 'error of perception' resulting in a deviation, inattentiveness or carelessness are imputed in the absence of some reasonable explanation...." R. at 367. In addition, the FAA's appellate briefs consistently describe its interpretation as a presumption or inference. *See, e.g.*, FAA Br. at 23 ("FAA employs the following presumption: where evidence shows that a pilot mistakenly fails to understand and comply with a clear and distinct ATC transmission, and where the pilot fails to provide an exculpatory explanation for his mistake, FAA presumes that the pilot's mistake was due to inattention...."); *see also id.* ("[I]t is fair and reasonable to infer that [Merrell's] mistake was attributable to inattention...."). The FAA's decision to "impute," "presume," or "infer" carelessness in a particular situation, Merrell argues, "is nothing more than a finding of fact,

to litigating positions taken upon judicial review:

Our decisions indicate that agency "litigating positions" are not entitled to deference when they are merely appellate counsel's "post hoc rationalizations" for agency action, advanced for the first time in the reviewing court. Because statutory and regulatory interpretations furnished in this setting occur after agency proceedings have terminated, they do not constitute an exercise of the agency's delegated lawmaking powers. The Secretary's interpretation of OSH Act regulations in an administrative adjudication, however, is agency action, not a post hoc rationalization of it.

499 U.S. at 156–57, 111 S.Ct. 1171 (citations omitted). In this case, it is particularly clear that the FAA's position is not simply that of its litigators, because after the agency instituted this enforcement action, it published its interpretation of § 91.123 in the form of an interpretive rule. *See* 64 Fed.Reg. 15,912 (1999).

which can be reversed by the NTSB." Merrell Br. at 14.

■ We note first that Merrell did not make this argument below, *see* Opp'n to Pet. for Recons., and that the NTSB did not itself refuse to defer on the ground that the FAA's interpretation was really a finding of fact. Even if we could nonetheless consider the argument here, it is plain that the FAA's decision to infer careless-ness from unexplained error does not rep-resent a finding of fact in this, or any other, particular case. To the contrary, the FAA's inference is simply a justifica-tion for the regulatory interpretation the agency applies in all cases—a rationale for why it is reasonable to declare a violation when a pilot errs and has no explanation for his error. Although the agency's rule does act like a presumption, a presumption is a rule of law and not a finding of fact. *See* W. PAGE KEETON ET AL., PROSSER & KEETON ON THE LAW OF TORTS 240 (5th ed.1984) ("There is ... general agreement that presumptions are rules of law....").

A presumption is valid if it is rational. *See Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 28, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976) (noting that a presumption will be upheld if there is "some rational con-nection between the fact proved and the ultimate fact presumed, and [if] the infer-ence of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate"); *see also NLRB v. Baptist Hosp.*, 442 U.S. 773, 787, 99 S.Ct. 2598, 61 L.Ed.2d 251 (1979); *Chemical Mfrs. Ass'n v. Department of Transp.*, 105 F.3d 702, 705–06 (D.C.Cir.1997). And surely it is rational to infer that a pilot was careless or inattentive if he deviated from a clearance order without any explanation at all. In this case, everyone who listened to the recording of the ATC clearance instructions—including Captain Merrell—confirmed that those instructions were clear and understandable. *See* J.A. at 14–

15, 18–19; R. at 145. Merrell's statement that he "misheard" the transmission is not an explanation for his deviation, but rather a concession that he has no explanation. Under such circumstances, it is not unrea-sonable to presume that he simply was not listening closely enough. Such a presump-tion is as common-sense as that employed in tort cases that hold that the running of a red light creates a presumption of negli-gence, rebuttable only by an exculpatory justification (such as brake failure).[9]

■ There is also no merit to Merrell's contention that the FAA's presumption im-permissibly reverses the burden of proof in NTSB proceedings—a point upon which, again, the Board did not rely. FAA regu-lations mandate that "[i]n proceedings un-der [49 U.S.C. § 44709], the burden of proof shall be upon the Administrator." 49 C.F.R. § 821.32. Merrell contends that the FAA's interpretation of section 91.123 is in reality an attempt to circumvent this evidentiary requirement. He asserts that "[h]aving failed to carry its burden of proof," the FAA "sought to eliminate that burden by inventing a legal 'interpreta-tion.'" Merrell Br. at 15. The Supreme Court considered a similar contention in *Director v. Greenwich Collieries*, 512 U.S. 267, 114 S.Ct. 2251, 129 L.Ed.2d 221 (1994). There, the Court construed § 7(c) of the Administrative Procedure Act (APA), 5 U.S.C. § 556(d), which imposes the "burden of proof" on the proponent of an order. The Court held that the phrase should be understood as having its "ordi-nary or natural meaning," which, it said, was the burden of persuasion. 512 U.S. at 272, 276, 114 S.Ct. 2251. Because the Labor Department rule at issue in *Green-wich* (the so-called "true doubt" rule) re-versed the persuasion burden, the Court struck it down. *See id.* at 280–81, 114 S.Ct. 2251. It indicated, however, that a presumption that did not shift the burden of persuasion would be acceptable under

---

9. *See, e.g., Byrne v. City & County of San Francisco*, 113 Cal.App.3d 731, 740–41, 170 Cal.Rptr. 302 (Cal.Ct.App.1980); *deJesus v. Seaboard Coast Line R.R. Co.*, 281 So.2d 198, 201 (Fla.1973); *Piatt v. Welch*, 974 S.W.2d 786, 788 (Tex.App.1998). *See generally* KEE-TON ET AL., *supra*, at 230–31 & n. 12.

the APA because it would not affect the "burden of proof." *Id.* at 280, 114 S.Ct. 2251. In accordance with this reasoning, every Circuit that has considered the issue since has concluded that a presumption that shifts only the burden of production does not shift the "burden of proof" as that phrase is used in the APA. *See Gulf & Western Industries v. Ling,* 176 F.3d 226, 232–34 (4th Cir.1999); *Glen Coal Co. v. Seals,* 147 F.3d 502, 510–13 (6th Cir.1998); *Lovilia Coal Co. v. Harvey,* 109 F.3d 445, 452 (8th Cir.1997). Merrell offers no reason to read the same phrase in section 821.32 any differently.

On this analysis, the FAA presumption at issue here is permissible if it shifts only the burden of production—and it does. That is the typical role of presumptions in modern evidence law,[10] and the FAA's description of its presumption indicates that it functions in the same manner. That is, once the FAA shows that a pilot failed to follow a clear ATC instruction, the burden of production shifts to the pilot to offer an exculpatory explanation.[11] Accordingly, we find no warrant for regarding the FAA's interpretation as the equivalent of a finding of fact or for concluding that it reverses the FAA's burden of proof, and hence no warrant for the NTSB's refusal to pay it appropriate deference.

## III

■■ Deference, of course, does not mean blind obedience. The agency's interpretation still must not be "plainly erroneous or inconsistent with the regulation" it is interpreting. *Cassell v. FCC,* 154 F.3d 478, 484 (D.C.Cir.1998) (quoting *Auer v. Robbins,* 519 U.S. 452, 461, 117 S.Ct. 905,

137 L.Ed.2d 79 (1997)). And even if the interpretation meets this standard, the NTSB need not follow it if it "is arbitrary, capricious, or otherwise not according to law." 49 U.S.C. § 44709(d)(3). We consider these two standards below.

■ First, we examine whether the FAA's interpretation was a reasonable construction of its regulation. The two subsections of section 91.123 that Merrell was charged with violating state:

(b) Except in an emergency, no person may operate an aircraft contrary to an ATC instruction in an area in which air traffic control is exercised.

. . . .

(e) Unless otherwise authorized by ATC, no person operating an aircraft may operate that aircraft according to any clearance or instruction that has been issued to the pilot of another aircraft for radar air traffic control purposes.

14 C.F.R. § 91.123.

Under the FAA's interpretation, a pilot who flies contrary to either of these commands is in violation unless he has an exculpatory explanation, such as "radio malfunction" or "ATC error resulting in a faulty transmission that precipitates a misunderstanding." FAA Br. at 15. This interpretation is consistent with the regulation. Indeed, the one respect in which it varies actually favors the pilot: it adds two exceptions (radio malfunction and precipitating ATC error) to the only two expressly listed in the rule itself (emergency and ATC authorization)—apparently because the FAA believes they are fairly implied.

---

10. *See* FED R.EVID. 301 ("[A] presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion. . . .").

11. *See* FAA Br. at 23 ("FAA employs the following presumption: where evidence shows that a pilot mistakenly fails to understand and comply with a clear and distinct ATC transmission, *and where the pilot fails to provide an*

*exculpatory explanation* for his mistake, FAA presumes that the pilot's mistake was due to inattention. . . .") (emphasis added). *Compare* FAA Pet. for Recons., R. at 371 (characterizing proof that deviation from ATC instruction occurred as establishing "prima facie case"), *with Thomas v. National Football League Players Ass'n,* 131 F.3d 198, 202 (D.C.Cir. 1998) (holding that proof of prima facie case of discrimination under Title VII creates rebuttable presumption that shifts burden of production but not burden of persuasion).

None of these exceptions assists Merrell, however, who has offered no explanation whatsoever for his failure to understand the clear and distinct ATC transmission. The FAA has also indicated, as a matter of its enforcement discretion, that in cases where ATC could have corrected a pilot's misunderstanding but did not, the agency will waive or reduce the sanctions for the violation (although it will still declare that the violation occurred). *See id.* at 18. Again, this offers Merrell no assistance, as it is undisputed that ATC could not have corrected Merrell's error, and in any event, the FAA has in fact waived any possible sanctions against him. We therefore find that the FAA's construction is a reasonable interpretation of its regulation, and that Merrell's case fits comfortably within that interpretation.

Second, we must determine whether the FAA's policy, as expressed in its interpretation, is arbitrary, capricious, or otherwise not in accordance with law. There is no question that the FAA's policy is harsh, but that does not make it unreasonable. The FAA contends that the rule's strictness is required by the potentially catastrophic consequences of noncompliance with ATC transmissions. In the agency's view, the only way to prevent air disasters is to ensure "that pilots exercise unflagging diligence in monitoring, understanding, and obeying clearly transmitted ATC instructions." *Id.* at 16–17. And the best way to ensure such diligence, the FAA has concluded, is to hold pilots to "an exacting standard of accountability." *Id.* at 17.

To continue our earlier analogy, the FAA's approach is somewhat akin to that of the motor vehicle safety laws. Although a driver may be able to defend the running of a red light on the ground of brake failure, the excuse that he simply "did not see it" does not avoid a ticket. Following the same logic, the FAA has concluded that while a radio malfunction can excuse a pilot's deviation from an ATC instruction, the claim that he simply "misheard it" does not. This approach is both rational and consistent with the Federal Aviation Act, which instructs the FAA to prescribe

rules that, in its judgment, "best tend[ ] to reduce or eliminate the possibility or recurrence of accidents in air transportation." 49 U.S.C. § 44701(c).

We recognize that the NTSB prefers a different approach, one which might best be expressed, in the words of Alexander Pope, as, "To err is human...." ALEXANDER POPE, *An Essay on Criticism, in* COLLECTED POEMS 58, 71 (Bonamy Dobree ed., Everyman's Library 1983) (1711). The "premise" of its approach, the Board states, is that "human beings make mistakes, and there is no regulatory action, remedial or otherwise, that can eliminate all mistakes." Order on Recons., J.A. at 38. Hence, the Board maintains that "where an inevitable error of perception does occur, the pilot should not face sanction if he has acted responsibly and prudently thereafter...." *Id.* Although we cannot say that this view is unreasonable, that is not the issue. The NTSB is bound to follow the FAA's interpretation of a regulation unless the Board finds it arbitrary, capricious, or otherwise unlawful. *See* 49 U.S.C. § 44709(d)(3). It was not arbitrary or capricious for the FAA to conclude that in the unforgiving environment of aviation, in which even good-faith error can lead to tragedy, the best way to encourage pilot attentiveness is through its harsh approach rather than the NTSB's more lenient one. This conclusion is consistent with the governing law, which makes clear that the FAA's principal responsibility is not to protect the interests of pilots, but rather to ensure that air carriers "provide service with the highest possible degree of safety in the public interest." *Id.* § 44701.

Finally, we consider Merrell's argument that the FAA's interpretation of subsections (b) and (e) of section 91.123 is arbitrary because it conflicts with readback procedures assertedly contained in subsection (a) of the same section. The FAA's position, Merrell stresses, means that "a pilot who inadvertently mishears a clearance, reads it back to the controller to check his understanding, and receives no

correction from the controller, would nevertheless be liable for a violation of § 91.123" barring an exculpatory explanation for the initial misunderstanding. Merrell Br. at 19. Yet, he continues, subsection 91.123(a) states that a pilot who is "uncertain" about a clearance must "immediately request clarification from ATC." *Id.* at 20 (quoting 14 C.F.R. § 91.123(a)). That request, according to Merrell, "is made through a readback, and the written procedures governing air traffic controllers obligate controllers to correct any errors in the readback." Merrell Br. at 20; *see supra* note 2. Because of that obligation, Merrell argues, pilots are entitled to take ATC silence as acknowledgment that their readback was correct. Moreover, he contends that if the FAA's position were accepted, "§ 91.123(a) would be superfluous" because a pilot uncertain about a clearance "could follow the instruction of § 91.123(a) precisely, but nevertheless be liable for violating § 91.123(b) if ATC improperly failed, either because of human or system error, to respond to the pilot's recitation of an incorrect clearance." Merrell Br. at 20.

There is no conflict between the FAA's interpretation of subsections 91.123(b) and (e) and the language of section 91.123(a). The latter provision refers to "clarification[s]," not readbacks, and the two are not the same. A request for clarification—which is mandatory when a pilot is "uncertain" about his clearance—requires ATC to transmit an affirmative clarifying response. If ATC fails to provide one, the pilot must renew his request until one is forthcoming. *See* 14 C.F.R. § 91.123(a); FAA Reply Br. at 7–8. A readback, by contrast, is a non-mandatory acknowledgment by the pilot which, if correct, does not require an affirmative response from the controller. *See* ATC PROCEDURES ¶ 2–72; 64 Fed.Reg. 15,912, 15,913 (1999).

The clarification procedure is not implicated in the current case, as Merrell does not contend he was uncertain about the ATC instruction.

Nor is the FAA's interpretation either inconsistent with, or rendered irrational by, what Merrell contends is the routine pilot practice of reading back clearances and taking ATC silence as acknowledgment of accuracy. "Readbacks," the FAA points out, "add a layer of safety redundancy." FAA Reply Br. at 8. If a pilot transmits a readback, ATC will usually be able to correct a misunderstanding even if the pilot himself did not realize there was one. But as this case shows, the readback procedure is not failsafe; there is no guarantee that ATC's silence means it has received and confirmed the pilot's transmission. This underscores the reasonableness of the FAA's policy, which requires pilots to perceive ATC instructions correctly and not to depend upon the potentially unreliable readback mechanism. *See id.* at 8, 17.[12]

## IV

▉▉▉▉▉ In support of the decision below, Merrell argues that the NTSB's holding is "thoroughly consistent with a well-established line of Board precedent." Merrell Br. at 17. The FAA contends that the opposite is true. As we discuss in this Part, the situation is far less clear than either party is willing to concede. But even if Merrell were correct, the fact that the Board followed its own precedent would not be a sufficient basis on which to uphold its decision. Because the FAA is entitled to launch new policies through administrative adjudication, it may sometimes be necessary for the NTSB to accommodate such policies by changing its jurisprudential course.

12. Although the FAA could make full readbacks mandatory and require pilots to await confirmation before proceeding, the agency has concluded that such a policy would disserve air safety by congesting radio frequencies. *See* 64 Fed.Reg. 15,913 (1999). Neither we nor the NTSB may second-guess that policy determination. Merrell also suggests that

the FAA could require the installation of technology "that would eliminate the problem at the root of this case: blocked radio transmissions." Merrell Br. at 21–22. Because this was not a part of the NTSB's rationale for rejecting the FAA's interpretation, we may not rely upon it here. *See Cassell,* 154 F.3d at 483 n. 5.

We begin by noting that there are actually two divergent lines of NTSB precedent in this area.[13] One line contradicts Merrell's position, holding that if a pilot deviates from an ATC instruction in the absence of an emergency, the pilot is in violation unless an external factor precipitated the error.[14] Under this line of cases, when the pilot cannot point to such a precipitating factor, the NTSB attributes the error to the pilot's own lack of care. And under this line, a violation is not excused even if the pilot reads back the misunderstood instruction and ATC fails to correct it, notwithstanding its ability to do so.[15]

The second line of NTSB precedent, that cited by Merrell, is more supportive of his position although not wholly supportive. Under this line, the Board will excuse a pilot's deviation if ATC error was a contributing cause.[16] In the typical case, a pilot misunderstands a clear ATC instruction, the pilot gives a readback that reflects this misunderstanding, and ATC receives the erroneous readback but fails to correct the error despite its ability to do so. The cases Merrell cites indicate the NTSB will exonerate pilots who deviate from ATC instructions under such circumstances. The underlying rationale of these cases, however, appears to be that ATC could have corrected the pilot's misunderstanding before a violation occurred. *See* cases cited *supra* note 16.[17] Indeed, the only precedent the NTSB itself cited in

13. The NTSB came close to acknowledging this point in its Order on Reconsideration. *See* J.A. at 38 ("As a principle of administrative law, we may modify our precedent.... We have done so over time with regard to this issue, with the FAA often in disagreement.").

14. *See Administrator v. Swafford & Coleman,* NTSB Order No. EA–4117 (1994), 1994 WL 108069, at *2 (holding that although "precedent recognizes that when ATC error is the initiating or primary cause of the deviation, the complaint will be dismissed," that is not the case where "the ground controller's instructions to [the pilot] were clear and unambiguous"); *Administrator v. Wolfenbarger,* NTSB Order No. EA–3684 (1992), 1992 WL 289055, at *3 (ruling that "the only regulatory exception to compliance with an [ATC] instruction is in-flight radio malfunction" and that pilot's claim he did not hear ATC instruction was therefore "irrelevant"); *Administrator v. Gentile,* 6 N.T.S.B. 60 (1988) (holding that "it is patent that deviation from an altitude clearance in positive control airspace is careless in the absence of an emergency or some other extenuating circumstances"); *Administrator v. Nelson & Keegan,* 2 N.T.S.B. 1900 (1975) (concluding that "the most reasonable explanation for respondents' following instructions issued to another flight" was that "respondents did not exercise the highest degree of care expected of airline pilots," and that regulatory violation was not excused by fact that "controller might have taken additional measures which could have averted a deviation of the magnitude that occurred"); *Administrator v. Wells,* 1 N.T.S.B. 1472 (1971) ("Inasmuch as the altitude restriction was transmitted ... twice, both times in clear terms, [the pilot's] failure to hear the clearance, and adhere to it, can only be attributed to carelessness on his part.").

15. *See Swafford & Coleman,* 1994 WL 108069, at *2. While the Board will not dismiss the violation under such circumstances, it will mitigate sanctions. *See id.* at *3; *see also Nelson & Keegan,* 2 N.T.S.B. at 1900 (stating that system imperfections and contributing controller error are "more appropriately given weight as mitigating circumstances" rather than as excuses for violations). As previously noted, the FAA waived sanctions altogether in Merrell's case.

16. *See Administrator v. Jackson,* NTSB Order No. EA–4381 (1995), 1994 WL 804033, at *3 n. 11 ("Our precedent holds that, 'even if a deviation from a clearance is initiated by an inadvertent mistake on the pilot's part, that mistake will be excused and no violation will be found if, after the mistake, the pilot takes action that, *but for ATC,* would have exposed the error and allowed for it to be corrected.' ") (quoting *Administrator v. Atkins & Richards,* NTSB Order No. EA–4078 (1994), 1994 WL 49589, at *2) (emphasis added); *Administrator v. Shields,* NTSB Order No. EA–4180 (1994), 1994 WL 267742, at *1 (suggesting that pilot would have defense if "ATC should have caught the mistake"); *Administrator v. Holstein,* 6 N.T.S.B. 569 (1988) (dismissing order "under unique circumstances" where ATC "either did not hear the miscommunication or was confused by it").

17. The NTSB administrative law judge in Merrell's case read these cases the same way. *See* J.A. at 26 ("In all of the cases where the

rejecting the FAA's petition for reconsideration, *Administrator v. Frohmuth & Dworak*, was a case in which the Board excused a violation because ATC, and not the pilot, was responsible for the initial misunderstanding.[18] Here, ATC was neither responsible for the initial misunderstanding nor capable of correcting it since it never received Merrell's readback.

More important, even if the NTSB had followed an unvarying line contrary to the regulatory interpretation the FAA advances here, that would not be sufficient to uphold the Board's decision in this case. As we noted at the outset, the interpretation of air safety regulations is an area in which the Board owes deference to the FAA. For that reason, consistency with the FAA's position is more important than consistency with the Board's own. As both the NTSB and Merrell concede, the FAA is authorized to initiate new regulatory interpretations through adjudication.[19] And because the Board is bound to follow such interpretations, it may at times be both necessary and proper for the Board to depart from its prior case law.[20]

■■ As discussed in Part II.A, the position the FAA takes here is neither new nor inconsistent with its previous view of a pilot's obligations. Nonetheless, there are still some constraints on the FAA's ability to bend the NTSB to its will in this case. For one, if a rule is to be applied to a regulated party, that party must have received fair notice. *See United States v. Chrysler Corp.*, 158 F.3d 1350, 1354 (D.C.Cir.1998); *General Elec. Co. v. EPA*, 53 F.3d 1324, 1328–29 (D.C.Cir.1995); *see also Martin*, 499 U.S. at 158, 111 S.Ct. 1171 (noting that decision to use adjudication "as the initial means for announcing a particular interpretation may bear on the adequacy of notice to regulated parties"). In this case, however, there was fair notice. The plain language of section 91.123 states that a pilot must follow ATC directions unless there is an emergency, and does not suggest that he may rely on readback procedures to absolve himself of responsibility.

■ An agency is also barred from applying a new rule in the adjudication in which it is announced if doing so would work a "manifest injustice." *Cassell*, 154 F.3d at 486–87 (quoting *Clark-Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074, 1081 (D.C.Cir.1987)).[21] In cases like this one, the issue boils down to the question of whether the regulated party

board has absolved these pilots of some responsibility, the circumstances have been that that responsibility has somehow been put back onto air traffic control . . . .").

**18.** *See Administrator v. Frohmuth & Dworak*, NTSB Order No. EA–3816 (1993), 1993 WL 75479, at \*2 (observing that pilot error at issue was "apparently *induced* . . . *by* ATC's actions" because ATC had "not clearly separated" instructions to Frohmuth's aircraft from those to another plane with similar call sign) (emphasis added).

**19.** *See Petition of Van Eaton*, 1998 WL 546384, at \*3 (acknowledging FAA's prerogative to advance regulatory interpretation through administrative adjudication even where such interpretation "amend[s]" the agency's prior approach); *Petition of Quintana*, 1992 WL 362084, at \*4–5 (deferring to FAA interpretation "offered officially for the first time in this proceeding" and not inconsistent "with the words of the rule or with [the Administrator's] past position"); *Miller*,

1992 WL 137750, at \*2–5 (deferring to FAA interpretation "now offered for the first time [but] not inconsistent with any prior interpretative pronouncements"); Merrell Br. at 16 (citing *Miller* as case in which "Board deferred to FAA interpretation of regulation, asserted for the first time in enforcement proceedings"). *Cf. Martin*, 499 U.S. at 158, 111 S.Ct. 1171 ("[T]he Secretary's interpretation is not undeserving of deference merely because the Secretary advances it for the first time in an administrative adjudication.").

**20.** *See Hinson*, 57 F.3d at 1149–50 ("Nor is the Board irrevocably bound to its own precedents, so long as it gives a reasoned explanation for its departure.").

**21.** In addition, the agency must (among other things) explain its change of course, and the new course must be neither arbitrary nor capricious. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *Hinson*, 57 F.3d at 1149–50.

reasonably and detrimentally relied on a previously established rule. *See id.* at 486. For the reasons discussed above, however, there was no established, contrary rule upon which Merrell could have relied. Again, the FAA's position on this matter has been unwavering, while the NTSB's position has been at most internally inconsistent. Nor does Merrell suggest that there is anything he would have done differently as a pilot had he known how the FAA would interpret its rule.[22] Accordingly, the NTSB's precedent in this area is insufficient to render the application of the FAA's interpretation to Merrell a "manifest injustice."

## V

■■■ Finally, Merrell complains that the FAA did not begin to characterize its position as a regulatory interpretation until its petition for reconsideration. Both before the ALJ and initially before the Board, Merrell contends, FAA counsel presented the case as a straightforward charge of factual carelessness. But the NTSB did not refuse to consider the FAA's interpretation argument on the ground of tardy presentation, and Merrell himself stops short of contending that the agency's tardiness should have barred it from making the argument, saying only that the point is "worth noting." Merrell Br. at 14. He does, however, strongly suggest that the FAA pursued an unfair strategy by shifting to a second theory after losing on the first. Three considerations lead us to conclude that the FAA's delay should not affect our disposition of this case.

First, it is true that the FAA did not initially argue that it interpreted its regulation to presume inattentiveness or carelessness in the absence of explanation; nor did it initially argue that the NTSB was required to defer to such an interpretation. On the other hand, the FAA also did not appear to limit itself solely to a claim of factual carelessness. For example, during

the initial hearing before the ALJ, the FAA's counsel argued: "The Board has stated that an altitude deviation in positive control airspace ... is carelessness in the absence of an emergency." R. at 201. Counsel also argued that pilots should be found in violation of section 91.123 whenever their errors were not initiated by external factors. *See id.* at 200, 213–14. These arguments are consistent with the position the FAA took on reconsideration. They suggest that the FAA's litigating posture was not so much strategic as simply muddled.

■■■ Second, we are not precluded from considering a regulatory interpretation simply because the FAA raised it for the first time in a petition for reconsideration below—at least not where, as here, the Board went on to consider and resolve the petition on the merits. The pertinent statute states that "the court may consider an objection to an order of the Board only if the objection was made in the proceeding conducted by the Board or if there was a reasonable ground for not making the objection in the proceeding." 49 U.S.C. § 1153(b)(4); *see also id.* § 46110(d). The reconsideration process qualifies as a proceeding conducted by the Board. *See* 49 C.F.R. § 821.50. Indeed, although in *Hinson* we rejected the FAA's effort to advance its regulatory interpretation because the agency had not raised it at all in the NTSB proceedings, we indicated we would have considered it had the FAA raised it at the reconsideration stage. *See Hinson,* 57 F.3d at 1148–49, 1150–51.

Third, and most important, Merrell does not suggest any way in which the late emergence of the FAA's interpretation argument prejudiced him. He does not contend, for instance, that if he had known of the argument earlier he would have litigated the factual issues differently. To the contrary, since Merrell construed the charge against him as one of pure factual carelessness, he had every reason to offer an explanation for his misperception of the

---

**22.** To the contrary, Merrell contends that "[n]o matter what happens" in this case, pilots will continue their current practices. Merrell Br. at 21.

**586**

ATC instructions at the initial hearing. And as he concedes he had no explanation, there was no further evidence he could have produced, regardless of how he understood the charge. Nor was Merrell disadvantaged in arguing the legal issues. After the FAA articulated its position in its petition for reconsideration, Merrell had a full opportunity to respond in opposition to the petition, and he did so. *See* R. at 382–92.

None of this excuses the FAA's failure to be clear about its position from the start. Given that the agency lost *Hinson* in part because it failed to raise its interpretation argument in a timely manner, one would think it would have taken care not to wait until the last possible moment to raise the argument this time around. Employing the same presumption the FAA applies to pilots, we would have to conclude that only the agency's "inattentiveness" explains its tardiness. But unlike a pilot, the agency—and, derivatively, the flying public—cannot be sanctioned for its inattentiveness through dismissal of the enforcement order issued in this case.

**VI**

Because the NTSB failed to defer to the FAA's reasonable interpretation of its own regulations, we conclude that the Board's ruling was not in accordance with law. We therefore grant the petition for review, reverse the Board's decision, and remand the case for further proceedings consistent with this opinion.[23]

---

**23.** As noted *supra* note 1, Merrell was also charged with "operat[ing] an aircraft in a careless or reckless manner so as to endanger the life or property of another," in violation of 14 C.F.R. § 91.13(a). On its face, § 91.13(a) could be read to require a different standard of care than § 91.123, since only the former expressly uses the term "careless." Nonetheless, Merrell makes no argument concerning § 91.13(a), apparently assuming that—as the FAA asserts—a § 91.13(a) violation can be wholly derivative of a § 91.123 violation. *See*

FAA Br. at 5 n.1 (citing *Jackson v. NTSB*, 114 F.3d 283, 287 (D.C.Cir.1997) (noting NTSB decision characterizing § 91.13(a) violation as "residual or derivative" of § 91.123 violation)); *see also Administrator v. Clark*, 7 N.T.S.B. 434, 436 (1990) (holding § 91.13(a) derivative of § 91.123); *Administrator v. Buller*, 6 N.T.S.B. 31, 32 (1988) (same). Accordingly, we reverse without addressing whether the standard of care under each of these regulations might be different.